

IN THE
TENTH COURT OF APPEALS

No. 10-13-00175-CV

BARBARA BATY,

                                                                    Appellant

 v.

OLGA L. FUTRELL, CRNA, AND
COMPLETE ANESTHESIA CARE, PC,

                                                                    Appellee


————————————


**From the 40th District Court
Ellis County, Texas
Trial Court No. 85552**


# DISSENTING OPINION


Appellant Barbara Baty is blind in her left eye because, during cataract surgery on that eye, Appellee Olga L. Futrell, a nurse anesthetist, administered retrobulbar anesthesia and extended the needle into Baty's optic nerve. Dr. Steven Chalfin, a board-certified ophthalmologist who has performed over 3,500 retrobulbar-anesthesia blocks, provided a seven-page, single-spaced amended expert report that concludes that Futrell breached the standard of care and caused Baty's blindness. According to Dr. Chalfin,

two of Baty's subsequent treating physicians also concluded that Futrell caused Baty's blindness. Because the majority affirms the trial court's dismissal of Baty's medical negligence claim against Futrell and his vicariously liable employer, Appellee Complete Anesthesia Care, P.C. (CAC), I respectfully dissent.

Baty filed suit against Futrell and CAC on August 7, 2012. Baty alleged that Futrell "was negligent in failing to carry out his nursing responsibilities in accordance with the accepted standards of nursing practice, and thereby, [in] proximately causing injuries and damages to [her]." Specifically, Baty alleged that Futrell was negligent:

a)      In failing to achieve adequate training and a level of competence in the techniques of regional ophthalmic anesthesia, including retrobulbar block, so as not to cause irreparable damage to Mrs. Baty's optic nerve; and

b)      In failing to ensure that the retrobulbular [*sic*] block anesthesia was performed on Mrs. Baty with sufficient competence and skill so as to avoid irreparably damaging her optic nerve with the needle during the block.

Baty alleged that CAC was vicariously liable for the negligence of Futrell under the doctrine of *respondeat superior*.

## Applicable Law

An "expert report" is "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West Supp. 2014). The report need represent only a good-faith effort to provide a fair summary of

the expert's opinions. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). And to constitute a good-faith effort to provide a fair summary of the expert's opinions, the report must address the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff calls into question and to provide a basis for the trial court to conclude that the claim has merit. *Id.* at 875. "[A]n expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013).

A report cannot merely state the expert's conclusions as to the standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 879. The expert must explain the basis for his statements and must link his conclusions to the facts. *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). But the report does not have to marshal all of the plaintiff's proof, and the plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. "The expert report may be informal and the information presented need not meet the same requirements as evidence offered in summary judgment proceedings or in a trial. … Also, it is the substance of the opinions, not the technical words used, that constitutes compliance with the statute." *Godat v. Springs*, No. 05-08-00791-CV, 2009 WL 2385569, at *3 (Tex. App.—Dallas Aug. 5, 2009, no pet.) (mem. op.) (citing *Ehrlich v. Miles*, 144 S.W.3d 620, 626-27 (Tex. App.—Fort Worth 2004, pet. denied)).

The supreme court recently reaffirmed that one purpose of the expert report requirement is "'to expeditiously weed out claims that have no merit.'" *Certified EMS,*

392 S.W.3d at 631 (quoting *Loaisiga v. Cerda,* 379 S.W.3d 248, 263 (Tex. 2012)). The court also stated that "the purpose of evaluating expert reports is 'to deter frivolous claims, not to dispose of claims regardless of their merits.'" *Id.* (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011)). "The Legislature's goal was to deter baseless claims, not to block earnest ones." *Id.* And even more recently, the supreme court articulated that the evaluation of an expert report must encompass all of the expert's factual statements and opinions. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) ("In its analysis however, the appeals court did not fully credit all of Dr. Jaffee's factual statements and opinions.").

## Standard of Review

When considering a motion to dismiss under subsection 74.351(b), the issue for the trial court is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See Palacios*, 46 S.W.3d at 877; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). A trial court's decision on a motion to dismiss a health-care liability claim is reviewed for an abuse of discretion. *Palacios*, 46 S.W.3d at 877.

> "However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*" *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279-80 (Tex. App.—Austin 2007, no pet.); *see also Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 197 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Though we may not substitute our judgment for that of the trial court, the trial court has no discretion in determining what the law is or applying the law to the facts.").

*Salais v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 531 (Tex. App.—Waco 2010, pet. denied). The "overriding principle guiding trial court discretion under section

74.351(c) … is the elimination of frivolous claims and the preservation of meritorious ones." *Samlowski v. Wooten,* 332 S.W.3d 404, 411 (Tex. 2011).

I believe that whether a report represents a good-faith effort to comply with the statutory definition of an expert report is a legal determination or a question of law, not a factual determination or a question of fact. Therefore, I disagree with the majority to the extent that it appears to confer discretion on the trial court for a question of law. For the same reason I also disagree with the majority's unsupported notion that the trial court's determination only has to be within "the zone of reasonable disagreement."

I agree with this court's suggestion that our review of a trial court's ruling on the adequacy of an expert report should be de novo:

> The trial court's review and our review of the expert report are the same; the trial court is in no better position than we are in reviewing the report; and whether the report represents a good-faith effort to comply with the statutory definition of an expert report is fundamentally a question of law. An expert report either complies with the statutory requirements (and the case law construing those requirements), or it fails to comply. No "discretion" is apparent in the analysis. We thus question the propriety of an abuse-of-discretion standard of review if that standard is something other than the trial court's applying the law to determine whether the report represents a good-faith effort to provide a fair summary of the expert's opinions. *See Grindstaff v. Michie,* 242 S.W.3d 536, 539 n.2 (Tex. App.—El Paso 2007, no pet.) (discussing appealing physician's suggestion that de novo standard should apply).

*Wooten v. Samlowski,* 282 S.W.3d 82, 85 n.1 (Tex. App.—Waco 2008), *aff'd as modified*, 332 S.W.3d 404 (Tex. 2011).

Justice Wainwright echoed this view:

> Appellate review of an expert report is analogous to review of a summary judgment. Appellate courts review the same pieces of paper that the trial court reviews. Personal observations of human behavior that appropriately

suggest deference to certain trial court rulings in proceedings with live witnesses do not arise when the trial court interprets a document. *See Otis Elevator Co. v. Parmelee,* 850 S.W.2d 179, 181 (Tex. 1993) ("[Where] the trial court heard no evidence but expressly based its decision on the papers filed and the argument of counsel ... there are no factual resolutions to presume in the trial court's favor."). I would suggest a de novo standard of review on appeal for rulings on the adequacy of expert reports under Chapter 74. *Cf. Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex. 2003) (reviewing a trial court's grant of summary judgment de novo); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650-51 (Tex.1999) (reviewing a trial court's legal conclusions on an unambiguous contract de novo).

*Samlowski,* 332 S.W.3d at 418 (Wainwright, J., dissenting in part and concurring).

## The Expert Report

On or about March 23, 2011, Baty underwent cataract surgery on her left eye at the Surgery Center of Waxahachie. Futrell, a nurse anesthetist, administered retrobulbar anesthesia for the procedure; he allegedly extended the needle into Baty's left optic nerve and caused permanent nerve damage and loss of sight.

Dr. Chalfin's seven-page, single-spaced amended report is divided into six sections. He first discusses his experience, training, and education, stating that he is a board-certified ophthalmologist and has performed over 3,500 retrobulbar blocks. There is no dispute as to his qualifications.

In the second and third sections of the amended report, Dr. Chalfin provides a list of the medical records and documents that he reviewed in developing his opinions and a summary of the medical care provided to Baty from March 23, 2011, the date of the cataract surgery, to June 18, 2012. Dr. Chalfin begins with a summary of the cataract surgery performed by Dr. Kemp:

Dr. Kemp performed phacoemulsification cataract extraction, left eye, with implantation of an intraocular lens on 23 March, 2011. The surgery was performed under retrobulbar anesthesia administered by Olga Futrell, CRNA. Of note, the initial block attempt produced inadequate akinesia and anesthesia, so a second retrobulbar block attempt was performed (Refs. 6, 11). This is significant because complications such as globe penetration and optic nerve injury are more common when blocks require augmentation (additional needle sticks). This is due to the fact that the initial injection volume can distort the anatomy of the orbital structures, and lead to injury by the needle on the subsequent attempt. For this reason, many Ophthalmic surgeons augment an inadequate block by using a blunt cannula inserted via a conjunctival incision, rather than a needle.

Dr. Chalfin's continued summary details that at least two other subsequent treating physicians have opined that Baty's vision loss was probably caused by the retrobulbar block.

The last three sections of Dr. Chalfin's amended report discuss the standard of care, breach of the standard of care, and causation, respectively, as follows:

**STANDARD OF CARE**

In evaluating and providing medical care for a patient such as Mrs. Baty, the standard of care for an ordinarily prudent practitioner such as a MD or CRNA requires:

1. Adequate preoperative assessment of the patient;
2. Adequate communication with the patient and/or the patient's family;
3. Performance of only procedures for which adequate training and level of competence has been achieved;
4. Performance of such procedures at the level of competence and skill required to minimize risk to the patient.
5. In the case of retrobulbar anesthetic blocks, administering the block in the proper manner to preclude injuring the delicate structures of the orbit, including the globe and optic nerve.

**BREACH OF STANDARD OF CARE**

In this case, Olga Futrell, CRNA breached the standard of care and was

negligent in the following ways:

1.     Failing to apply the required level of training and competence, based on sound anatomical principles, in the techniques of regional ophthalmic anesthesia including retrobulbar block;
2.     Failing to ensure that the retrobulbar block anesthesia was performed on Mrs. Baty with sufficient competence and skill to avoid damaging her optic nerve;
3.     Irreparably damaging Mrs. Baty's left optic nerve during the administration of the retrobulbar block by sticking it with the retrobulbar needle.

It is my opinion that Olga Futrell, CRNA failed to meet the standard of care and that the above mentioned omissions and failures constitute substandard and negligent medical care.

## CAUSATION

It is also my opinion that the negligent and substandard medical care mentioned above contributed to the injury, loss of vision, and requirement for additional follow up medical care for Mrs. Baty.

This negligence was a proximate cause of Mrs. Baty's injuries as follows:

1.     Injury to the left optic nerve during the retrobulbar block by sticking it with the retrobulbar needle;
2.     Permanent loss of visual acuity in the left eye;
3.     Permanent central scotoma in the left eye;
4.     Permanent loss of stereopsis (fine depth perception).
5.     Requirement for additional ophthalmic medical care, beyond the routine postoperative course of cataract surgery.

In my opinion, the patient's prognosis is as follows: It is certain to a reasonable medical probability that Mrs. Baty will never achieve the potential visual and functional improvement offered by uncomplicated cataract extraction.

The outcome should have been different for the following reasons: (1) the patient underwent successful cataract surgery in the right eye, by the same surgeon, in 2009. (2) Had appropriate care and skill been used during the retrobulbar block, the patient would not have suffered injury to her optic

nerve. Absent this injury, the surgery would have had a successful outcome.

## Standard of Care and Breach

This case is very similar to a recent Corpus Christi case. In *Garza v. DeLeon*, No. 13-13-00342-CV, 2013 WL 6730177 (Tex. App.—Corpus Christi Dec. 19, 2013, no pet.) (mem. op.), the plaintiffs alleged that the defendant physician overused an electrocautery device during the circumcision performed on their four-year-old son, causing him to develop two holes (fistulas) on his penis that required reconstructive surgery. *Id.* at *1. The expert report stated that "[t]he standard of care applicable to all circumcisions is to perform the circumcision by removing an appropriate amount of foreskin without excessive bleeding and without injury to the urethra or glans penis." *Id.* at *3. Specifically,

> the physician must avoid incising the urethra with a cutting agent, or with a suture placed for hemostasis. In other words, fistulas may result from … either accidental crushing of the urethra by the circumcision clamp, or from a stitch placed in the underside of the penis to control excessive bleeding at the site of the frenulum. Additionally, a fistula can be caused by incising the urethra with the scalpel or electrocautery device.

*Id.* The expert then stated in the report that, in his opinion:

> [The physician] breached the standard of care here by using the electrocautery device improperly and too aggressively. She removed too much skin, burned [the child's] penis by overcauterizing it, and she also created two fistulas in his urethra. This in turn caused substantial bleeding and the later complications that [the child] experienced and continues to experience…. Urethral fistulas are not a normal or non-negligent result of circumcision. Rather, in my experience and opinion, it is a breach of the applicable standards of care to conduct the circumcision in such a way that results in fistulas. It indicates that the physician failed to carefully conduct the surgery, removing too much skin, cutting into the urethra or crushing the urethra—or all three.

*Id.*

Regarding the standard of care, the defendant physician argued that the report was deficient because it did not explain "what [she] was specifically required to do to avoid injury while removing foreskin," did not quantify "how much foreskin was appropriate to remove and how much was too much," and did not discuss "what specifically [she] was required to do in exercising 'great care' while using electrocautery so as not to damage the urethra or the glans." *Id.* The physician claimed that "[w]ithout this information, [she] is left to guess what specific action she was required to take." *Id.* Regarding breach of the standard of care, the physician similarly argued that the statement in the report was conclusory because it did not give her notice of the claims against her by explaining how much skin should have been removed and how much use of electrocautery was reasonable and how much was excessive. *Id.* The physician asserted that the report therefore was nothing but an extended conclusory statement that "impermissibly concludes that a bad result equates to negligence." *Id.*

The court stated:

> The report must only contain a "fair summary" of the standard of care and the alleged departure from it that is sufficient to inform [the defendant physician] of the conduct that appellees are calling into question and to provide a basis for the trial court to conclude that the claims against [the defendant physician] are meritorious.

*Id.* at *4. The court then declared that, after considering the report "in its entirety," the trial court was justified in finding that the report discussed the two elements of the standard of care and breach with sufficient specificity to fulfill the dual purposes of the

expert report requirement. *Id.* The court reasoned:

> The report states the actions [the defendant physician] was supposed to avoid doing when conducting the surgery: cutting into the urethra with either a scalpel or an electrocautery tool, crushing the urethra with the circumcision clamp, or puncturing the urethra with a suture, and that the injuries [the child] suffered were the proximate result of [the defendant physician] departing from the applicable standard of care by doing at least one of those things.

*Id.*[1]

In this case, the fifth statement in the "Standard of Care" section of Dr. Chalfin's report states that the standard of care for an ordinary prudent practitioner such as an MD or a CRNA requires, "[i]n the case of retrobulbar anesthetic blocks, administering the block in the proper manner to preclude injuring the delicate structures of the orbit, including the globe and optic nerve." Similarly to the complaint in *Garza*, Futrell and CAC argue that this statement is conclusory because Dr. Chalfin does not explain what the "proper manner" is for administering the block that would have avoided injury.

But, like in *Garza*, this one statement in the "Standard of Care" section of Dr. Chalfin's report must be considered with the report *in its entirety*. *See Van Ness*, 461 S.W.3d at 144 ("In its analysis however, the appeals court did not fully credit all of Dr. Jaffee's factual statements and opinions."); *Garza*, 2013 WL 6730177 at *4 (considering the report "in its entirety"). In my view, the majority errs by not fully crediting all of Dr. Chalfin's views, *i.e.*, by not considering the report in its entirety.

In the third section of the report, where Dr. Chalfin provides a brief summary of

---

[1] *Garza* relied in part on our opinion in *Benson v. Vernon*, 303 S.W.3d 755 (Tex. App.—Waco 2009, no pet.), which is discussed below. *Garza*, 2013 WL 6730177 at *4.

the medical care provided Baty, he states that the cataract surgery was performed under retrobulbar anesthesia administered by Futrell. The "initial block attempt produced inadequate akinesia and anesthesia," so Futrell performed a second retrobulbar block attempt. Dr. Chalfin explains:

> This is significant because complications such as globe penetration and optic nerve injury are more common when blocks require augmentation (additional needle sticks). This is due to the fact that the initial injection volume can distort the anatomy of the orbital structures, and lead to injury by the needle on the subsequent attempt.

Dr. Chalfin then explains what would be a proper manner to avoid injury to the optic nerve when the initial retrobulbar block produces inadequate akinesia and anesthesia: "For this reason, many Ophthalmic surgeons augment an inadequate block by using a blunt cannula inserted via a conjunctival incision, rather than a needle." *See Godat*, 2009 WL 2385569, at *3 ("it is the substance of the opinions, not the technical words used, that constitutes compliance with the statute").

In the "Breach of Standard of Care" section,[2] Dr. Chalfin then specifically explains that Futrell breached the standard of care by "[i]rreparably damaging Mrs. Baty's left optic nerve during the administration of the retrobulbar block by sticking it with the retrobulbar needle." Regarding this last statement, Futrell and CAC also complain that Dr. Chalfin never explains how or why sticking the optic nerve with the retrobulbar needle falls below the standard of care and that the trial court therefore did not have enough information to determine that Baty's claim had merit. The report, however,

---

[2] Because I believe that the amended report is also adequate on the elements of breach and causation, I will address them as well.

plainly explains that, in Dr. Chalfin's opinion, the needle stick of the optic nerve is what caused Baty's vision loss. *See id.* Dr. Chalfin further points to two subsequent treating physicians whose diagnosis is that Baty's optic nerve was probably injured by the retrobulbar block injection.

Our precedent also supports my conclusion. The report in *Benson v. Vernon*, 303 S.W.3d 755 (Tex. App.—Waco 2009, no pet.), *overruled on other grounds by Certified EMS*, 392 S.W.3d at 632, is similar to Dr. Chalfin's amended report. In *Benson*, Dr. Gorman, the expert, identified the standard of care in his expert report as follows: "The standard of care for a surgeon performing a breast augmentation is *to not cause a pneumothorax during the procedure.*" *Id.* at 758 (emphasis added).

> Dr. Gorman explained that pneumothorax is a rare but known possible complication of breast augmentation, commonly caused by the "needle injection for local anesthesia and interoperative laceration of the pleura." This occurs when the needle is advanced too far or is misplaced/misdirected. This can be prevented by paying attention to the "placement in depth of the injection" and the "dissection plane."
>
> ….
>
> Dr. Gorman opined that Dr. Benson breached the standard of care … by causing Vernon to suffer a pneumothorax during surgery. He believed that Dr. Benson caused the pneumothorax by "stray[ing] out of the normal dissection plane and enter[ing] the pleural cavity."

*Id.*

On appeal, Dr. Benson complained that Dr. Gorman failed to provide a fair summary of the standard of care by neglecting to explain how he breached the standard of care, what he should have done differently to prevent and treat the pneumothorax, or how the appropriate depth and dissection plane are determined. *Id.* at 760. He contended

that Dr. Gorman's analysis as to the standard of care and causation was conclusory. *Id.* We disagreed, holding "that the trial court was justified in finding that they discuss[ed] the standard of care, breach, and causation with sufficient specificity to fulfill the statutory requirements." *Id.*

And in our more recent decision in *Jassin v. Bennett*, No. 10-12-00053, 2012 WL 5974020 (Tex. App.—Waco Nov. 29, 2012, no pet.), the expert report stated:

> The standard of medical care following sinus surgery performed on Tom Bennett would be to carefully and gently vacuum the nose after using topical anesthesia *to prevent pain following the sinus surgery*. Dr. Jassin deviated from the standard of reasonable medical care when, according to Tom Bennett, he gouged the lower part of the patient's nose with the hard suction device on the vacuum. When the patient screamed in pain[,] the "hard" vacuuming should have immediately stopped and topical anesthesia reapplied if further debridement necessary. Instead, according to Tom Bennett, Dr. Jassin continued to exert significant force on the inside of the right nostril of Tom Bennett with the hard plastic suctioning device until the inside of the patient's nose started bleeding profusely. The conduct described by Tom Bennett in his statement indicates a failure to follow the standard of reasonable medical care under the circumstances and, based on a reasonable medical probability, is the cause of the injuries described under the causation section of this report.

*Id*. at * 3 (emphasis added).

Dr. Jassin contended on appeal that the report did not "set forth a clear standard of care and breach of that standard of care in such a manner to cause harm to Bennett and that the trial court abused its discretion in finding that Dr. Branch's reports adequately provided the causal relationship between his alleged failure to meet the applicable standard of care and the injury, harm, or damages claimed." *Id.* at *2. We disagreed, holding:

The report plainly sets forth the standard of care applicable to Dr. Jassin, how he breached it, and how the breach caused Bennett's injuries. Dr. Branch's report addresses how Dr. Jassin's conduct has been called into question, as well as the causal relationship between Dr. Jassin's alleged negligence and Bennett's injuries. It is sufficiently specific; it is not conclusory. The report provided a sufficient basis for the trial court to conclude that Bennett's claim against Dr. Jassin has merit. We conclude that Dr. Branch's report represents an objective good-faith effort to comply with the definition of an expert report.

*Id.* at *2.

Futrell and CAC's arguments regarding the standard of care and its breach rely on *Palacios*. While a patient at American Transitional, Palacios fell from his bed and required medical care for his injuries. *Palacios*, 46 S.W.3d at 876. Palacios and his family sued American Transitional for negligently failing to prevent the fall. *Id.* The Palacioses primarily relied on one sentence in their expert report to establish the standard of care: "Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized." *Id.* at 879-80. The supreme court stated:

Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given."

*Id.* at 880. The court concluded that the statement—that precautions to prevent Palacios's fall were not properly used—was not a statement of a standard of care. *Id.* The court reasoned, "Neither the trial court nor American Transitional would be able to determine from this conclusory statement if [the expert] believes that the standard of care required American Transitional to have monitored Palacios more closely, restrained him more

securely, or done something else entirely." *Id.*

Futrell and CAC then argue that several courts of appeals, following *Palacios*, have in turn concluded that expert reports containing opinions allegedly similar to Dr. Chalfin's on standard of care or its breach were conclusory and thus inadequate to meet the statutory requirements. Futrell and CAC first cite and discuss *Guerrero v. Ruiz*, No. 13-07-00682-CV, 2008 WL 3984167 (Tex. App.—Corpus Christi Aug. 29, 2008, no pet.) (mem. op.), in which the expert report stated that the defendant failed to protect the phrenic nerve during an operation on the neck of the plaintiff, which goes against a standard of care mandating that the nerve be preserved. *Id.* at *2-3. The court held that this was similar to the "bare assertion" in *Palacios* and that the report did not therefore sufficiently set out the standard of care. *Id.* at *3. The court reasoned, "It is entirely unclear from the report … what specific actions were required by [the defendant] to preserve the phrenic nerve (e.g., isolate the phrenic nerve through the use of a medical apparatus, or perhaps simply possess a steadier hand)." *Id.*

In *Merritt v. Williamson*, No. 01-08-00293-CV, 2008 WL 2548128 (Tex. App.—Houston [1st Dist.] Jun. 26, 2008, no pet.) (mem. op.), the plaintiff sued several doctors for injuries arising from the doctors' alleged failure to ascertain and properly treat a skin disease. *Id.* at *1. The plaintiff served the doctors with several expert reports. *Id.* The court reached the following conclusions as to one of the doctors. One report stated that the doctor caused injury to the plaintiff and did not meet the standard of care. *Id.* at *5. The report further explained that the lack of diagnosis should have been questioned, other treatment should have been considered, and the plaintiff should have been referred

to a specialist. *Id.* The court held that this report fell short in identifying the standard of care because it did not "give any *specific* information about what the defendant doctors should have done differently." *Id.* Another report stated that a competent plastic surgeon "would have at least started to wonder why the diseases kept recurring" and "would have started to be curious after the third or fourth surgery why the skin ulcers were recurring." *Id.* at *6. The report further stated that the doctor's "lack of any attempt to discover an etiology for [the plaintiff's] disease, and his continued operative intervention despite continued failure [fell] well below the standard of care for a competent, well trained plastic surgeon." *Id.* The trial court held that this report was also inadequate because it wholly failed to specify any action that the doctor should have taken. *Id.* The court noted, "Merely reciting the term 'standard of care,' without setting out or describing what actions or courses of action are encompassed within the standard, does not satisfy the requirement that a report substantively express the applicable standard of care." *Id.*

In *Wilcox v. Montalvo*, No. 13-10-611-CV, 2011 WL 1443689 (Tex. App.—Corpus Christi Apr. 14, 2011, no pet.) (mem. op.), the expert report stated:

> The standard of care in transferring patients from wheelchair to bed or vice versa, is to take proper precautions to make certain that the patient does not drop to the floor. This is especially true when an elderly amputee is being transferred. No documentation in either [the defendant's] or the hospital records gives an appropriate explanation for why the patient was dropped. Therefore it appears that dropping her to the floor was a failure to exercise proper safety precautions.

*Id.* at *1. The Corpus Christi court held that the report was deficient with respect to the standard of care and its breach. *Id.* at *4-5. Citing *Palacios*, the court reasoned that the

report was conclusory with respect to the standard of care and its breach because it did

not mention what precautions should have been taken to properly transfer a patient and

in what manner the defendant acted or failed to act in accordance with those precautions.

*Id.* at *4. Justice Garza, however, disagreed, stating in her dissent:

> The majority holds that [the expert's] report does not "articulate what specific negligent conduct has been called into question," but it does—it states that [the patient's] being dropped to the floor was the conduct called into question. The majority holds that the report does not "specifically describe the standard of care for transferring a disabled patient," but it does—it states that the applicable standard is to avoid dropping patients to the floor. The majority holds that the report does not state "what [the defendant] and his staff did or failed to do" that breached the standard of care, but it does—it states that [the defendant] or his staff breached the standard by dropping [the patient] to the floor. The majority holds that the report does not state "what a reasonable and prudent physician would have done in the same or similar circumstances," but, again, it does—a reasonable physician and staff would not have dropped an elderly, amputee patient to the floor.

*Id.* at *7 (Garza, J., dissenting).

Futrell and CAC finally cite *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740

(Tex. App.—Houston [14th Dist.] 2011, no pet.), a case in which the plaintiff was molested

while at the defendant hospital. The expert reports in that case provided as follows:

- The defendant hospital was required to "supervise[] closely and house [] safely" any "aggressive [or] sexually aggressive 14 year old girl with a history of being both sexually molested and perpetrating sexual molestation herself so she could not harm another patient" and provide treatment of patients such as the plaintiff "in a safe environment." The hospital staff "breached both these standards of care—effective, careful supervision of a predator and careful, effective protection of a molestation victim."

- Defendant doctors were required "to ensure that there were appropriately trained and adequate staffing and milieu structure" so that a "young"

patient "would not be sexually molested." They breached "their duties to [the plaintiff]" by failing to do so.

- While they "may each have different standards of care in some areas," the defendant hospital and doctors "share the most rudimentary responsibility for the safety and security of their patients … in whatever therapeutic milieu their patient is being treated. The safety and security of any patient is always a most basic element in the standard of care." The "treating team" must "provide additional supervision" to patients with histories "of hurting themselves and being vulnerable to being hurt by others." The defendant hospital and doctors breached this standard of care, as "[the plaintiff] was not afforded the most basic supervision under their care."

- The defendant hospital must not "allow any harm to occur to any of its patients." The standard of care for the hospital "is to supervise the behavior of each and every patient." "Based on the facts contained in the medical records," the hospital breached its standard of care by failing to provide "a safe and secure environment" and "allowing" the plaintiff "to be molested by another patient."

- The defendant doctor was required to "do anything necessary" to "insure that any patient she treats in [the] hospital … has been admitted to a safe and secure milieu" by "be[ing] aware of the treatment milieu, patient population, and the structure and safety measures" in place. She breached the standard of care by failing to "insur[e] her patient's basic safety using any number of measures available."

*Id.* at 743, 748-49. The court concluded that the articulation of the standard of care was deficient because it was conclusory:

Other than containing conclusory statements regarding the provision of a secure environment, the supervision of patients, and the prevention of harm to patients, the reports do not indicate what an ordinarily prudent health care provider would do under the same or similar circumstances. They merely include [the expert's] conclusion that appellants did not provide a safe and secure environment for [the plaintiff], but do not specify how this should have been accomplished.

*Id.* (citation omitted). The court also concluded that the statements regarding breach of

the standard of care, such as the doctor's "failing to ensure that there were appropriately

trained and adequate staffing and milieu structure such that a young girl (about whom they were forewarned was vulnerable) would not be sexually molested" and "breach[ing] the standard of care by not insuring her patient's safety using any number of measures available" and appellants' failing to "provide additional supervision" and "not afford[ing] [the plaintiff] … the most basic supervision," were conclusory. *Id.* at 750. The court explained, "Whether a defendant breached the standard of care cannot be determined without 'specific information about what the defendant should have done differently." *Id.*

I believe, however, that the present case is more similar to our precedent (*Benson* and *Jassin*) and to *Garza*, the Corpus Christi case that is discussed above and that is much more recent than the two Corpus Christi cases relied on by Futrell and CAC. In this case, Dr. Chalfin's report, taken in its entirety, informs Futrell and CAC that the applicable standard of care requires the CRNA to administer the retrobulbar block in a manner that does not injure the optic nerve and that Futrell breached the standard of care by sticking Baty's left optic nerve with the retrobulbar needle when administering the retrobulbar block a second time after the initial retrobulbar block had produced inadequate akinesia and anesthesia. *See Garza*, 2013 WL 6730177, at *4 (holding that report in its entirety was sufficiently specific because it "states the actions [the doctor] was supposed to avoid doing when conducting the surgery: cutting into the urethra with either a scalpel or an electrocautery tool, crushing the urethra with the circumcision clamp, or puncturing the urethra with a suture, and that the injuries [the boy] suffered were the proximate result of [the doctor] departing from the applicable standard of care by doing at least one of

those things").

Dr. Chalfin's amended expert report plainly apprises Futrell and CAC of the conduct that Baty is calling into question and provided enough information to provide a basis for the trial court to conclude that the claims are meritorious.

**Causation**

An expert report must provide "enough information linking the defendant's breach of the standard of care to the plaintiff's injury." *Salais*, 323 S.W.3d at 531 (quoting *Baker v. Gomez*, 276 S.W.3d 1, 8 (Tex. App.—El Paso 2008, pet. denied)); *see Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 271 (Tex. App.—Fort Worth 2009, no pet.) ("To establish causation, an expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury.") (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)). An expert report on causation is not required to rule out every possible cause of the injury, harm, or damages claimed. *Jassin*, 2012 WL 5974020, at *5, n.3 (citing *Hillcrest Baptist Med. Ctr. v. Payne*, No. 10-11-00191-CV, 2011 WL 5830469, at *5 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem. op.)). Also, an expert can make inferences from medical records. *Granbury*, 296 S.W.3d at 265.

As noted above, Dr. Chalfin's report states that he reviewed Baty's medical records. In that section of his report, Dr. Chalfin begins with a summary of the anesthesia aspect of the cataract surgery performed by Dr. Kemp:

> The surgery was performed under retrobulbar anesthesia administered by Olga Futrell, CRNA. Of note, the initial block attempt produced inadequate akinesia and anesthesia, so a second retrobulbar block attempt was performed. This is significant because complications such as globe penetration and optic nerve injury are more common when blocks require

augmentation (additional needle sticks).  This is due to the fact that the initial injection volume can distort the anatomy of the orbital structures, and lead to injury by the needle on the subsequent attempt.  For this reason, many Ophthalmic surgeons augment an inadequate block by using a blunt cannula inserted via a conjunctical incision, rather than a needle.

Dr. Chalfin then details that at least two other subsequent treating physicians have opined that Baty's vision loss was probably caused by the retrobulbar block:

The patient was examined by Dr. O'Malley on 3 June, 2011.  On that visit the visual acuity was measured at 20/150-2.  The patient was noted to have an afferent papillary defect in the left eye.  An OCT showed central thinning of the nerve fiber layer when compared to the study performed in March, 2011.  Dr. O'Malley stated that his impression was "L CRAO (central retinal artery occlusion) with residual central scotoma.  Told will be permanent scotoma—most likely a complication of RB (retrobulbar) or peribulbar injection."

….

The patient was examined by Dr. Robert Tenery on 18 June, 2012.  Dr. Tenery found optic atrophy of the left eye and noted that the patient "lost central VA OS during LE + IOL probably from retrobulbar block."

In short, Dr. Chalfin's report states that the standard of care required Futrell to administer the retrobulbar block in a manner that did not injure Baty's optic nerve, that Futrell breached the standard of care by "[i]rreparably damaging Mrs. Baty's left optic nerve during the administration of the retrobulbar block by sticking it with the retrobulbar needle," and that this breach caused Baty's loss of vision in her left eye.  And according to Dr. Chalfin, at least two other physicians are of the opinion that Futrell's "needle stick" injured Baty's optic nerve.

Futrell and CAC argue that Dr. Chalfin's causation opinion is conclusory.  I disagree; his opinion, including his permissible reliance on Baty's medical records,

plainly provides "enough information linking the defendant's breach of the standard of care to the plaintiff's injury." *Salais*, 323 S.W.3d at 531.

Dr. Chalfin's report represents an objective good-faith effort to comply with the definition of an expert report because it adequately addresses at least one pleaded liability theory. *See Certified EMS*, 392 S.W.3d at 631. I respectfully dissent to the majority's contrary conclusion and would hold that the trial court erred and abused its discretion in granting Futrell's and CAC's motions to dismiss and would sustain Baty's sole issue.

REX D. DAVIS
Justice

Delivered and filed November 19, 2015

