Dr. [Richard] Kemp performed phacoemulsificationcataract extraction, left eye, with implantation of an intraocular lens.... The surgery was performed under retrobulbar anesthesia administered by Olga Futrell, CRNA. Of note, the initial block attempt produced inadequate akinesia and anesthesia, so a second retrobulbar block attempt was performed. This is significant because complications such as globe penetration and optic nerve injury are more common when blocks require augmentation (additional needle sticks). This is due to the fact that the initial injection volume can distort the anatomy of the orbital structures, and lead to injury by the needle on the subsequent attempt. For *691 this reason, many Ophthalmic surgeons augment an inadequate block by using a blunt cannula inserted via a conjunctival incision, rather than a needle.
....
... [A] clinical exam and the imaging studies, done in the immediate postoperative period, showed a completely normal retina and optic nerve head. This absolutely rules out any of the other subsequently postulated causes of poor vision such as a cilioretinal artery occlusion [or] anterior ischemic optic neuropathy....
....
In summary, the history, clinical findings, and temporal course in Mrs. Baty's case indicate that she suffered an injury to the left optic nerve during the retrobulbar block administered by Olga Futrell, CRNA. While several other tentative diagnoses were raised by physicians who saw the patient in consultation, these diagnoses were ruled out by the clinical examination or ancillary studies....
....
STANDARD OF CARE
In evaluating and providing medical care for a patient such as Mrs. Baty, the standard of care for an ordinarily prudent practitioner such as a [sic] MD or CRNA requires:
1. Adequate preoperative assessment of the patient;
2. Adequate communication with the patient and/or the patient's family;
3. Performance of only procedures for which adequate training and level of competence has been achieved;
4. Performance of such procedures at the level of competence and skill required to minimize risk to the patient;
5. In the case of retrobulbar anesthetic blocks, administering the block in the proper manner to preclude injuring the delicate structures of the orbit, including the globe and optic nerve.
BREACH OF STANDARD OF CARE
In this case, Olga Futrell, CRNA breached the standard of care and was negligent in the following ways:
1. Failing to apply the required level of training and competence, based on sound anatomical principles, in the techniques of regional ophthalmic anesthesia including retrobulbar block ;
2. Failing to ensure that the retrobulbar blockanesthesia was performed on Mrs. Baty with sufficient competence and skill to avoid damaging her optic nerve;
3. Irreparably damaging Mrs. Baty's left optic nerve during the administration of the retrobulbar block by sticking it with the retrobulbar needle.
It is my opinion that Olga Futrell, CRNA failed to meet the standard of care and that the above mentioned omissions and failures constitute substandard and negligent medical care.
CAUSATION
It is also my opinion that the negligent and substandard medical care mentioned above contributed to the injury, loss of vision, and requirement for additional follow up medical care for Mrs. Baty.
This negligence was a proximate cause of Mrs. Baty's injuries as follows:
1. Injury to the left optic nerve during the retrobulbar block by sticking it with the retrobulbar needle;
2. Permanent loss of visual acuity in the left eye;
*692 3. Permanent central scotoma in the left eye;
4. Permanent loss of stereopsis (fine depth perception)[;]
5. Requirement for additional ophthalmic medical care, beyond the routine postoperative course of cataract surgery.
In my opinion, the patient's prognosis is as follows: It is certain to a reasonable medical probability that Mrs. Baty will never achieve the potential visual and functional improvement offered by uncomplicated cataract extraction.
The outcome should have been different for the following reasons: (1) the patient underwent successful cataract surgery in the right eye, by the same surgeon, in 2009. (2) Had appropriate care and skill been used during the retrobulbar block, the patient would not have suffered injury to her optic nerve. Absent this injury, the surgery would have had a successful outcome.
(Internal citations omitted).
The defendants objected to this report as well and moved to dismiss Baty's claims. The trial court granted both defendants' motions to dismiss, finding the report "deficient with respect to the elements of standards of care, breach of standards of care, and causation." A divided court of appeals affirmed, holding the report is inadequate as to the standard-of-care element because it is silent as to "what an ordinarily prudent CRNA should have done in this instance" and is therefore conclusory. 543 S.W.3d 269, 275, 2015 WL 7443677 (Tex. App.-Waco 2015) (mem. op.) (emphasis omitted). We granted Baty's petition for review.
II. Discussion
A. Statutory Framework
In reviewing a medical expert report's sufficiency, we begin with a discussion of the Texas Medical Liability Act's pertinent provisions and our decision in American Transitional Care Centers of Texas, Inc. v. Palacios , 46 S.W.3d 873 (Tex. 2001). The Act requires a claimant to serve an expert report early in the proceedings on each party against whom a health care liability claim is asserted. TEX. CIV. PRAC. & REM. CODE § 74.351(a).[1] We have explained that "eliciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits." Palacios , 46 S.W.3d at 877 ; see also Certified EMS, Inc. v. Potts , 392 S.W.3d 625, 631 (Tex. 2013) ("[T]he purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits." (citation and internal quotation marks omitted)).
In line with that purpose, if the claimant fails to timely serve an expert report, then on the affected health care provider's motion the trial court must dismiss the pertinent health care liability claim with prejudice and award attorney's fees. TEX. CIV. PRAC. & REM. CODE § 74.351(b).[2] However, if *693 the motion challenges the adequacy of an otherwise timely report, the court may grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [Act's] definition of an expert report." Id. § 74.351(l). In turn, the Act defines "expert report" as
a written report by an expert[3 ] that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.
Id. § 74.351(r)(6).
In Palacios , we elaborated on the standard governing whether a report qualifies as a good-faith effort to comply with the statutory requirements. 46 S.W.3d at 875. The claims against the hospital in that case arose after a patient, who had severe brain damage and had been prescribed bed restraints, fell from his hospital bed. Id. at 876. The expert report cited the nursing notes, which documented that the patient's restraints were on ten minutes before the fall and that he was found on the floor with his restraints on but not tied to the bed. Id. at 879. The report stated that the patient "had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized." Id. The trial court concluded that the report was insufficient and granted the hospital's motion to dismiss. Id. at 876.
Addressing the proper standard of review, we concluded that a trial court's decision to dismiss a case based on an inadequate expert report is reviewed under an abuse-of-discretion standard. Id. at 878.[4] We then explained that the report "need not marshal all the plaintiff's proof," id. , but it "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit," ids="11094124,11094165" index="14" url="https://cite.case.law/sw3d/46/873/">id. at 875. We concluded that the report at issue contained "conclusory statements" that did not "put the defendant or the trial court on notice of the conduct complained of"-i.e., whether the hospital should have "monitored [the patient] more closely, restrained him more securely, or done something else entirely." Id. at 880. In light of the absence of information about what the hospital should have done differently, we held the trial court did not abuse its discretion in concluding the report did not qualify as "a good-faith effort to provide a fair summary of the standard of care and how it was breached." Id.
In applying the Palacios framework, we have confirmed that a report's adequacy does not depend on the use of "any particular 'magic words,' " so long as it contains sufficient information "within the document's four corners" to fulfill Palacios 's two-part mandate: (1) informing the defendant of the specific conduct called into question and (2) providing a basis for the trial court to conclude the claims have *694 merit. Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52-53 (Tex. 2002). And we have explained that courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes such information. See Van Ness v. ETMC First Physicians , 461 S.W.3d 140, 144 (Tex. 2015) ; see also Austin Heart, P.A. v. Webb , 228 S.W.3d 276, 282 (Tex. App.-Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive."). With this framework in mind, we turn to Dr. Chalfin's report.
B. Analysis
1. Standard of Care
The substance of Baty's malpractice claim is that Futrell's negligence in administering the retrobulbar anesthetic block caused permanent nerve damage and vision loss in her left eye. In evaluating the sufficiency of Dr. Chalfin's expert report in support of this claim,[5] particularly with respect to the standard-of-care element, three statements in different sections of the report are especially pertinent:
• "[C]omplications such as globe penetration and optic nerve injury are more common when blocks require augmentation (additional needle sticks)," as was the case here, because "the initial injection volume can distort the anatomy of the orbital structures, and lead to injury by the needle on the subsequent attempt. For this reason, many Ophthalmic surgeons augment an inadequate block by using a blunt cannula inserted via a conjunctival incision, rather than a needle."
• The standard of care for an ordinarily prudent CRNA administering a retrobulbar block requires "administering the block in the proper manner to preclude injuring the delicate structures of the orbit, including the globe and optic nerve."
• Futrell breached the standard of care and was negligent in "[f]ailing to ensure that the retrobulbar blockanesthesia was performed on Mrs. Baty with sufficient competence and skill to avoid damaging her optic nerve" and in "[i]rreparably damaging Mrs. Baty's left optic nerve during the administration of the retrobulbar block by sticking it with the retrobulbar needle."
Baty argues that Dr. Chalfin's report, taken as a whole, provides enough information regarding his opinions on the elements of her claim to comply with the Act. Baty describes the report as articulating: "(1) the standard of care (do not puncture the optic nerve with the [retrobulbar] needle); (2) breach of the standard of care (puncturing the optic nerve with the needle); and (3) causation (puncturing the optic nerve damaged the optic nerve and caused permanent vision loss to the eye)." She asserts the report is not rendered conclusory by the fact that the standard of care in this case "is fairly basic," i.e., "do not stick the optic nerve with the anesthesia needle." The defendants respond that Baty mischaracterizes the report's description of the standard of care. They note that the stated standard of care is merely to administer the block in the "proper manner," with no description of what the "proper manner" entails. Thus, they contend, Dr. Chalfin's report uses the same sort of conclusory and unsupported language we held insufficient in Palacios .
*695 We agree with the defendants that the report's statement that the block should be administered "in the proper manner" in order to avoid injuring the eye, by itself, is on par with the expert's conclusory opinion in Palacios that unspecified "precautions to prevent [the patient's] fall were not properly utilized." 46 S.W.3d at 879-80 ;[6] cf. Jernigan v. Langley , 195 S.W.3d 91, 93 (Tex. 2006) (holding that a passing reference to the fact that the patient's case was "discussed" with the defendant physician "does not identify with specificity any action or inaction by [the defendant] that breached the applicable standard of care"). Similarly, in Lawton v. Joaquin , on which the defendants rely, the inadequate expert report stated that the standard of care applicable to a surgeon conducting an abdominoplasty required preservation of a sufficient blood supply to the abdominal wall, but failed to explain "how a surgeon goes about preserving a sufficient blood supply" or how the defendant physician failed to do so. No. 04-13-00613-CV, 2014 WL 783340, at *3 (Tex. App.-San Antonio Feb. 26, 2014, pet. denied) (mem. op.). None of these statements provide the requisite "specific information about what the defendant should have done differently." Palacios , 46 S.W.3d at 880.
But viewing the report at issue here in its entirety, we agree with Baty that the standard of care described by Dr. Chalfin encompasses a more specific directive. See Van Ness , 461 S.W.3d at 144. After explaining that the inadequate initial block attempt increased the risk of optic nerve injury and that the block should be administered in the proper manner to preclude such injury, Dr. Chalfin opines that Futrell breached the standard by "sticking [the optic nerve] with the retrobulbar needle" "during the administration of the retrobulbar block." If "sticking [the optic nerve] with the retrobulbar needle" is a breach of the standard of care-which, in turn, requires administering the block in the proper manner-then the "proper manner" necessarily encompasses not sticking the optic nerve with the retrobulbar needle. Unlike Palacios , in which we refused to infer from the report that the hospital's untaken "precautions to prevent [the patient's] fall" included tying the restraints to the bed more securely, here we need not infer anything; the report expressly references the "specific conduct the plaintiff has called into question." Palacios , 46 S.W.3d at 879.[7]
The court of appeals nevertheless concluded that more was required than merely stating that Futrell should not have inserted the retrobulbar needle into the optic nerve. 543 S.W.3d at 275. The court faulted the report for failing to "specify what actions, procedures, or treatment was either required or should have been performed or provided by Futrell while administering the retrobulbar block" in order to avoid inserting a needle into the optic nerve. Id. at 274 (emphasis omitted). Similarly, the defendants complain of "the absence *696 of specific information about an ordinarily prudent CRNA's duties as to this procedure and this patient, about what the CRNA should have done differently, and about what care was expected from the CRNA but not provided."
As to this claim and this report, we disagree that more detail was required. Dr. Chalfin does not simply state in the report that he knows the standard of care and concludes that it was not met. Palacios , 46 S.W.3d at 880 ; see also Scoresby v. Santillan , 346 S.W.3d 546, 556 (Tex. 2011) ("No particular words or formality are required, but bare conclusions will not suffice." (internal citations omitted)). Nor, as the dissent suggests, does he improperly equate negligence with a bad or unsuccessful result. See Tex. W. Oaks Hosp., LP v. Williams , 371 S.W.3d 171, 197 (Tex. 2012) (noting "the long-recognized principle that a physician who exercises ordinary care ... is not liable to a patient for a bad outcome").[8] That is, he does not opine that Futrell was negligent merely because the cataract surgery was unsuccessful or because Baty suffered permanent nerve damage or vision loss. Inserting the needle into the optic nerve is not a result, good or bad; it is conduct that allegedly caused a bad result in this case. And it is this specific conduct that Dr. Chalfin opines falls below the standard of care.
Both Baty and the defendants cite Garza v. DeLeon in support of their respective positions. No. 13-13-00342-CV, 2013 WL 6730177 (Tex. App.-Corpus Christi-Edinburg Dec. 19, 2013, no pet.) (mem. op.). Although the opinion is not binding, we find the court of appeals' discussion helpful in this case. In Garza , a child's parents brought a health care liability claim against the doctor who performed an elective circumcision on their son. Id. at *1. They alleged that the doctor's negligence in performing the procedure, including overuse of an electrocautery device to stop excessive bleeding, caused two urethrocutaneous fistulas, which are holes between the urethra and the skin of the penis. Id. The plaintiffs' expert report stated that the standard of care was "to perform the circumcision by removing an appropriate amount of foreskin without excessive bleeding and without injury to the urethra." Id. at *3. More specifically, the report stated that the physician "must avoid incising the urethra with a cutting agent, or with a suture placed for hemostasis," and that "fistulas may result from ... either accidental crushing of the urethra by the circumcision clamp, or from a stitch placed in the underside of the penis to control excessive bleeding," as well as "by incising the urethra with the scalpel or electrocautery device." Id. (alteration in original). The report also stated that the doctor breached the standard of care by "removing too much skin, cutting into the urethra or crushing the urethra-or all three." Id.
The doctor challenged the report, arguing it was "nothing but an extended conclusory statement" that did not specifically explain what actions were required to avoid injury while performing a circumcision, as it did not describe how much foreskin should have been removed or how electrocautery should have been used to avoid damaging the urethra. Id. The court of appeals concluded that such detail was *697 not required at the expert-report stage, which precedes full litigation of the claim on its merits. Id. at *4 ; see also Palacios , 46 S.W.3d at 879 (confirming that "the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial"). The court ultimately held that the report was sufficient because it "states the actions [the doctor] was supposed to avoid doing when conducting the surgery: cutting into the urethra with either a scalpel or an electrocautery tool, crushing the urethra with the circumcision clamp, or puncturing the urethra with a suture." Garza , 2013 WL 6730177, at *4.
The Garza court's conclusion is sound and in line with our precedent. And Dr. Chalfin's report is sufficient for the same reason: it states a specific action-sticking the optic nerve with the retrobulbar needle-Futrell was supposed to avoid doing when administering the retrobulbar block. Further, the report highlights the known increased risk associated with the procedure following the initial inadequate block attempt, noting an alternative procedure that may be employed in that situation. The report's express reference to an alternative method provides some indication of what Futrell should have done differently.[9] Palacios , 46 S.W.3d at 880. Additional detail is simply not required at this stage of the proceedings.[10]
Of course, the expert report's assertion that the standard of care requires or prohibits a particular action does not conclusively establish that fact. The parties to a medical-malpractice case may-and often do-disagree over what the standard of care in fact requires. Although Dr. Chalfin opines that the standard of care absolutely prohibits inserting the needle into the optic nerve, Futrell may present expert testimony that such conduct, while perhaps disfavored and discouraged, does not always and necessarily constitute a breach of the standard of care and will do so only if accompanied by other specific conduct. Such a controverting opinion would create a fact issue on the standard of care, but it does not negate the fact that Dr. Chalfin has identified what he believes the standard of care prohibits. Because his report identifies the "conduct being called into question"-inserting the needle into the optic nerve-and provides the trial court a basis to conclude Baty's claims have merit, it satisfies the good-faith effort the statute requires.
2. Breach and Causation
Although the court of appeals did not address the report's sufficiency as to breach and causation, the parties argued those issues here, and we will address them in the interest of judicial economy. Pedernal Energy, LLC v. Bruington Eng'g, Ltd. , 536 S.W.3d 487, 495, 2017 WL 1737920 (Tex. 2017). The report's sufficiency as to the breach element is tied to its sufficiency as to standard of care. For the reasons discussed, the report adequately explains that Futrell breached the standard of care by "sticking [the left optic nerve] with the retrobulbar needle" during the administration of the retrobulbar block.
*698 We also hold that the report represents a good-faith effort to summarize the causal relationship between Futrell's failure to meet the applicable standard of care and Baty's injury. Bowie Mem'l Hosp. , 79 S.W.3d at 53. Dr. Chalfin concludes that the optic nerve was injured during the administration of the retrobulbar block, again, based on the specific conduct of sticking the optic nerve with the retrobulbar needle. He also notes that other postulated causes of Baty's vision loss were ruled out by subsequent examination or ancillary studies, and that Baty had previously undergone successful cataract surgery on her right eye. The defendants contend that, because the report does not adequately explain what steps Futrell should have followed to avoid the injury, the report similarly does not explain how Futrell's failure to follow those steps caused Baty's injury. We reject the premise of this argument for the reasons discussed and therefore reject the otherwise unsupported conclusion. The report sufficiently addresses causation.
III. Conclusion
We hold that the trial court abused its discretion in concluding Dr. Chalfin's expert report does not represent a good-faith effort to meet the Medical Liability Act's requirements and in dismissing Baty's health care liability claims. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.
Justice Johnson filed a dissenting opinion, in which Justice Brown joined.
Justice Blacklock did not participate in the decision.
Justice Johnson, joined by Justice Brown, dissenting.
After Barbara Baty filed an expert report by Dr. Steven Chalfin in an attempt to comply with requirements of the Texas Medical Liability Act (TMLA), see TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6), the parties agreed that the report was deficient. The trial court granted a thirty-day extension to allow Baty to cure the deficiencies, and she filed an amended report from Dr. Chalfin. The amended report added little but a few more references to the retrobulbar block performed by a certified registered nurse anesthetist (CRNA), Olga Futrell. Those references were to the effect that the procedure had not been performed in a "proper manner" to avoid injuring the optic nerve. Futrell responded by objecting to the second report and moving for dismissal of Baty's suit. The trial court granted the motion and the court of appeals affirmed. 543 S.W.3d 269 (Tex. App.-Waco 2015).
This Court has construed the TMLA as setting a relatively low bar as to what comprises an adequate expert report. But, even a low bar must be cleared. In my view, the trial court did not abuse its discretion in determining that Dr. Chalfin's second report does not do so.
Both Dr. Chalfin's first and second reports are divided into discrete sections, four of which are labeled "Brief Summary of Medical Care," "Standard of Care," "Breach of Standard of Care," and "Causation." The Standard of Care section of the first report, which the parties agreed was inadequate, is as follows:
In evaluating and providing medical care for a patient such as Mrs. Baty, the standard of care for an ordinarily prudent practitioner such as a MD or CRNA requires:
1. Adequate preoperative assessment of the patient;
2. Adequate communication with the patient and/or the patient's family;
*699 3. Performance of only procedures for which adequate training and level of competence has been achieved;
4. Performance of such procedures at the level of competence and skill required to minimize risk to the patient.
The Standard of Care section in the second report differs from the one in the first by including an additional fifth statement:
In evaluating and providing medical care for a patient such as Mrs. Baty, the standard of care for an ordinarily prudent practitioner such as a MD or CRNA requires:
1. Adequate preoperative assessment of the patient;
2. Adequate communication with the patient and/or the patient's family;
3. Performance of only procedures for which adequate training and level of competence has been achieved;
4. Performance of such procedures at the level of competence and skill required to minimize risk to the patient;
5. In the case of retrobulbar anesthetic blocks, administering the block in the proper manner to preclude injuring the delicate structures of the orbit, including the globe and optic nerve.
The "standard" added is "administering the block in the proper manner to preclude [injury]." This substantively says nothing more than what Hippocrates long ago wrote: "The physician must ... have two special objects in view with regard to disease, namely, to do good or to do no harm." HIPPOCRATES , OF THE EPIDEMICS bk. I, § 2(5) (Francis Adams trans., 2009) (400 B.C.E). Dr. Chalfin's report says nothing about how to properly perform, or how not to perform, a retrobulbar block-it just says "do no harm."
Dr. Chalfin specified what he considered to be the standards of care and set them out in the section labeled Standard of Care. According to the Court, however, sufficiency of the report with respect to the standards of care does not turn on what Dr. Chalfin said the standards are. Rather, the Court says the standard of care hinges on "three statements in different sections of the report [that] are pertinent." Ante at 694. Only the second of those is what Dr. Chalfin says is a standard of care. The first statement relied on by the Court is taken from a paragraph in the section of the report Dr. Chalfin labeled Brief Summary of Medical Care. There, Dr. Chalfin explains that it was necessary to perform two retrobulbar blocks on Baty because the first "produced inadequate akinesia and anesthesia," which could "distort the anatomy of the orbital structures, and lead to injury by the needle on the subsequent attempt. " (Emphasis added). The third statement the Court references comes from the section of the report Dr. Chalfin labeled Breach of Standard of Care, and is simply more of the same.
Each of the statements the Court quotes to support its conclusion references "retrobulbar block" as the procedure Futrell performed. However, none of the quoted statements-or any other part of the report-explains what a retrobulbar block is or touches on how it should have been "properly" accomplished, other than saying what I doubt anyone would question: that the desired result should not be a needle stick to the optic nerve. Indeed, the Court circularly says that the result here is determinative of the requirement that an adequate report must say how Futrell failed to meet the standard of care:
If "sticking [the optic nerve] with the retrobulbar needle" is a breach of the standard of care-which, in turn, requires *700 administering the block in the proper manner-then the "proper manner" necessarily encompasses not sticking the optic nerve with the retrobulbar needle.
Ante at 695. "In the proper manner" simply does not say how Futrell should or should not have performed the block. No rational person would believe that a nurse anesthetist training program would teach a student how to perform a retrobulbar block by handing the student a syringe filled with anesthetizing liquid and saying, "Do a retrobulbar block on this patient in a proper manner-that means don't stick the optic nerve." Nor would any rational CRNA perform a procedure such as this without training as to how it should be done to minimize the possibility of unintended injury to a patient's eye. Certainly, Dr. Chalfin's report evidences his belief that there are "proper" ways for a CRNA to do a retrobulbar block-he just never explains how any of them are done. He says only that "proper care" would not have yielded a bad result. A m e d i c a l dictionary defines "retrobulbar" as referring to the space behind the eyeball. Retrobular , DICTIONARY OF OPTOMETRY AND VISUAL SCIENCE (7th ed. 2009). Given the nature of this case, one would surmise that the block performed by Futrell involved injecting the back part of Baty's eyeball or somewhere in proximity to it. Common sense would lead one to also surmise that performing an injection into either the back part of the eyeball or the space behind it would require some type of medical equipment with which to guide the needle insertion or make fairly specific measurements as to the correct placement and angle of needle insertion because the area in or behind the back part of the eyeball is not readily visible to the person making the injection. But common sense and surmise may not be right: maybe the standard for how a retrobulbar block should be administered by a nurse anesthetist is for it to be done solely visually and by touch and feel regarding the structures around the eyeball without specialized equipment at all. But whether the injection actually requires the use of specialized equipment, exact measurements, a more nuanced approach involving the feel of the patient's facial structures, or a combination of some or all of these is not the question. The question is what Dr. Chalfin explains in his report, and whether the trial court could have concluded that he did not explain, in a nonconclusory manner within the four corners of the report, how the injection should have been done (or not done) by Futrell, and what the standard of care was for a CRNA performing the procedure. Jelinek v. Casas , 328 S.W.3d 526, 539 (Tex. 2010) (stating that all information needed for the inquiry must be found within the four corners of the expert report). As noted above, in order to reach its decision, the Court must cobble together three statements from different sections of the report to support its conclusion, even though the report does not say that two of the three statements fix the standard. That is, Dr. Chalfin specified in a discrete section of the report what his opinion of the standard of care was. The Court goes outside that section to reach its conclusion that the report is adequate and effectively holds that the trial court abused its discretion by taking the report at face value. I disagree that a trial court abuses its discretion by reading an expert report to say what the expert says.
But even looking to the substance of the report as construed by the Court, one of the statements that the Court relies on and quotes is to the effect that an unsuccessful first block attempt is "significant because complications such as globe penetration and optic nerve injuryare more common when blocks require augmentation *701 (additional needle sticks)" because the first attempt "can distort the anatomy of the orbital structures and lead to injury by the needle on the subsequent attempt." Ante at 690 (emphasis added). Several aspects of this statement are noteworthy. First, Dr. Chalfin did not say, and the trial court could have concluded that Dr. Chalfin did not believe, his statement reflected a standard of care for a CRNA because the statement was not in the Standard of Care section of the report. Second, Dr. Chalfin notes that optic nerve injuries are "more common" under circumstances like those facing Futrell when he administered the second block. Third, Dr. Chalfin is not critical of either how the first block was done or its result. And Dr. Chalfin does not opine on whether distortion of the structures in Baty's eye actually occurred as a result of the first attempted block. Nor does he say that if that had occurred, just how much distortion there would have been. Fourth, he mentions that under the circumstances "many Ophthalmic surgeons augment an inadequate block by using a blunt cannula inserted via a conjunctival incision, rather than a needle." But in making that statement, Dr. Chalfin does not say what a cannula is; how a cannula would have been used; whether, in his opinion, a cannula should have been used and, if so, exactly how; or say whether a CRNA such as Futrell was qualified to make a conjunctival incision and insert a cannula through it.
The Court cannot reference Dr. Chalfin's explanation of what a "retrobulbar block" consists of because, as noted above, the report does not explain what such a procedure is. Nor can the Court reference Dr. Chalfin's description of how such a procedure should be performed with a needle in order for it to be "in the proper manner" because the report does not contain that information either. Likewise, the Court cannot address the report's description of how a second block should have been performed in light of the possibly altered structure of Baty's eyeball following the first attempted block, even though the second block by Futrell is the one that Dr. Chalfin opines damaged Baty's optic nerve. Why not? Because just as the report does not ever explain what a retrobulbar block is or how it is properly performed, the report does not explain how a second block should have been accomplished under these circumstances in order to have been "in the proper manner." All it says, in substance, is don't have a bad result by sticking the optic nerve. But a bad result, in and of itself, does not evidence breach of a standard of care. Univ. of Tex. Sw. Med. Ctr. at Dall. v. Estate of Arancibia , 324 S.W.3d 544, 550 (Tex. 2010). Much less does it evidence what the standard of care is. Nor can achieving a good result or, said the other way, avoiding a bad result, be the standard of care for medical treatment. If good or bad results were the standard, many medical treatments or courses of treatment would fail to measure up. See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios , 46 S.W.3d 873, 880 (Tex. 2001).
For the report to set out the "proper manner" in which to perform a retrobulbar block it necessarily would have had to explain both what should have been done and how it should have been done. Jelinek , 328 S.W.3d at 539-40 (holding that an expert report must explain how a breach of the standard of care occurred); Palacios , 46 S.W.3d at 880 ("Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently."). That includes more than just stating the desired result-"don't stick the optic nerve with the needle"-which the Court concludes is *702 sufficient, even though the trial court found otherwise. Ante at 694. That is especially so in circumstances such as those here, where Dr. Chalfin said in his report that injuries to the optic nerve are "more common" in blocks administered after an unsuccessful first attempt. And, even if "don't stick the optic nerve" were a standard of care, Dr. Chalfin's report does not say how Futrell should have accomplished not sticking it. And the how is the critical-and necessary-aspect of an adequate report. See Jelinek , 328 S.W.3d at 539-40.
The Court's analysis regarding the alternative procedure Dr. Chalfin's report referenced as being used by many ophthalmic surgeons to augment an inadequate block-use of "a blunt cannula inserted via a conjunctival incision, rather than a needle"-shows to some extent what a proper report might look like. It at least partially advises the trial court "how" the second block could have been done, even though there is no explanation of how to make a conjunctival incision or insert a cannula through it to perform a block while avoiding the optic nerve. The Court notes that the statement does not apply to a CRNA like Futrell. Ante at 697 n.9. And the report did not establish that a procedure calling for making a conjunctival incision and inserting something called a "cannula" through it into Baty's eyeball was within the training and skill level of a CRNA such as Futrell. Nor did the report say that the appropriate standard of care required the use of a blunt cannula regardless of whether the procedure was performed by a surgeon or CRNA. While the Court apparently believes that the statement indicates "less risky alternatives exist," the trial court may not have. After all, the report does not say that making a conjunctival incision and using a cannula is less risky than the procedure used by Futrell. And even if it did, reference to some unexplained type of "less risky procedure" is not what is required for an expert report to be adequate. First, "less risky" neither establishes a standard of care nor indicates that how Futrell performed the block did not meet the standard of care. An adequate report must explain the standard of care and how it was breached clearly enough for the trial court to conclude that the procedure used did not meet the standard. Dr. Chalfin never opined that the procedure used by Futrell was one that did not meet the appropriate standard. And recall, the trial court's decision is reviewed for an abuse of discretion. Even if this were a close call, and in my view it is not, we have said that close calls go to the trial court. See Larson v. Downing , 197 S.W.3d 303, 304 (Tex. 2006).
In sum, Dr. Chalfin's report does not do what this Court has said over and over is required: set out the standard of care for how the procedure should have been done, or not done, and explain how the defendant's actions did not meet that standard. The Standard of Care section of Dr. Chalfin's report offers only generalized conclusory opinions that the bad result was because of (1) failure to apply an unexplained "required level of training and competence ... in the techniques of regional ophthalmic anesthesia including retrobulbar block"; (2) failing to perform the block with some unexpressed level of "sufficient competence and skill"; and (3) "sticking [the optic nerve] with the retrobulbar needle." That is not sufficient. Jelinek , 328 S.W.3d at 539 (Tex. 2010) (explaining that an expert report in a medical malpractice action cannot merely *703 state the expert's conclusions about the elements); Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52 (Tex. 2002) (noting that an expert must explain the basis of his statements and link his conclusions to the facts); Palacios , 46 S.W.3d at 879 (holding a report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements).
In my view, the court of appeals properly analyzed the record and applied the law. For the reasons expressed above and the reasons the court of appeals gave, I would affirm its judgment. Because the Court does otherwise, I respectfully dissent.

When Baty filed suit in 2012, the Act required service of the report within 120 days of the date the plaintiff's original petition was filed. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, amended by Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590. The current version, which took effect in 2013, requires service within 120 days of the date the defendant's original answer is filed. Act of May 22, 2013, 83d Leg., R.S., ch. 870, § 2, 2013 Tex. Gen. Laws 2217, 2217 (codified at Tex. Civ. Prac. & Rem. Code § 74.351(a) ). The deadline is not at issue in this case.

If a report is not timely served "because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency." Tex. Civ. Prac. & Rem. Code § 74.351(c).

Dr. Chalfin's qualifications as an expert under the Act have never been questioned.

Citing the dissent in the court of appeals, Baty summarily argues that a de novo standard of review should apply. See 543 S.W.3d at 275-76 (Davis, J., dissenting). Baty did not present this as an issue in her petition, and we see no reason to depart from the well-established abuse-of-discretion standard recognized in Palacios and reiterated in subsequent cases. E.g. , Jernigan v. Langley , 195 S.W.3d 91, 93 (Tex. 2006) ; Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52 (Tex. 2002).

Because Baty brought vicarious-liability claims against Futrell's employer, the report is sufficient to implicate the employer's conduct so long as it meets the statutory standards as to Futrell. Certified EMS, Inc. v. Potts , 392 S.W.3d 625, 632 (Tex. 2013).

The Fourteenth Court of Appeals held similarly in Kingwood Pines Hospital, LLC v. Gomez , in which a minor patient who was admitted to the hospital for a psychiatric evaluation was allegedly molested by another patient. 362 S.W.3d 740, 743 (Tex. App.-Houston [14th Dist.] 2011, no pet.). The court held that the expert report's conclusory description of the hospital's standard of care, which included providing a safe environment, supervising patients, and preventing harm to patients, did not indicate what an ordinarily prudent provider would do under the circumstances. Id. at 749.

In Palacios , we implied that a sufficient report as to standard of care could have included, for example, a statement that the hospital should have "monitored [the patient] more closely" or "restrained him more securely." 46 S.W.3d at 880. We did not indicate that any further specificity was required.

Relatedly, the Act requires the inclusion of the following jury instruction following a trial on a health care liability claim:
A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.
Tex. Civ. Prac. & Rem. Code § 74.303(e)(2).

Although the report describes the blunt-cannula procedure as one used by "many Ophthalmic surgeons," as opposed to CRNAs, the significance of this portion of the report is its recognition that less risky alternatives exist.

For example, the report could have stated that the CRNA should "exercise great care when inserting the needle not to stick the optic nerve" and that Futrell failed to exercise such care. Arguably, this provides an additional degree of specificity, but we fail to see how it adds anything of substance, particularly in light of the purposes the report is intended to serve.