

# NUMBER 13-23-00237-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**RAMONA ROGERS, M.D.,
MODESTO ZAMBRANO,
STEPHANIE CUMPIAN, ROLANDO
FLORES, HECTOR ONTIVEROS,
PRISCILLA NIETO, SONIA
HERNANDEZ-KEEBLE,
BLAS ORTIZ JR., DAVID MORON
M.D., AND JAIME FLORES,**                                                **Appellants,**

**v.**

**DAVID SAXON BAGLEY,
INDIVIDUALLY, AND AS
REPRESENTATIVE OF THE
ESTATE OF JEREMIAH RAY
BAGLEY,**                                                     **Appellee.**

---

## ON APPEAL FROM THE 444TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Peña**

Appellants Ramona Rogers, M.D., Modesto Zambrano, Stephanie Cumpian, Rolando Flores, Hector Ontiveros, Priscilla Nieto, Sonia Hernandez-Keeble, Blas Ortiz Jr., David Moron, M.D., and Jaime Flores appeal the denial of their motion to dismiss a health care liability claim (HCLC) filed by appellee David Saxon Bagley, individually and as representative of the estate of Jeremiah Ray Bagley. In one issue, with multiple sub-parts, appellants argue that the trial court abused its discretion in denying its motion to dismiss and overruling their objections to Bagley's medical expert reports. We reverse and remand.

## I. BACKGROUND

Following the death of his thirty-seven-year-old son, Jeremiah, Bagley sued Rio Grande State Center (RGSC) and several of its employees. Jeremiah, who had a history of paranoid schizophrenia, was committed to RGSC, a state mental health facility, following an arrest for assault and resisting arrest. While there, Jeremiah was involved in multiple altercations with other patients, and he was ultimately assigned one-to-one supervision. After Jeremiah physically struck his one-to-one monitor, five psychiatric nurse assistants (PNAs) intervened to restrain him and administer injectable anti-psychotic and sedative drugs, Olanzapine and Diphenhydramine.

Jeremiah then calmed down and walked to his room. However, he soon became agitated, disoriented, and pale. Shortly thereafter, Jeremiah went into cardiac arrest. Staff performed CPR, and when EMS arrived, they administered CPR using an automated

2

chest compression device. Jeremiah was transported to a hospital, where he was pronounced dead.

An autopsy revealed Jeremiah had several fractured vertebrae, cracked ribs, a lacerated spleen, and contusions on his head, shoulders, back, and chest. His cause of death was listed as "excited delirium due to psychosis with restraint-associated blunt force trauma."

Bagley sued individually and as the representative of Jeremiah's estate. He named RGSC, who he later non-suited, along with ten individual defendants: the five PNAs[1] involved in the incident, four RGSC supervisors,[2] and Jeremiah's treating physician, Dr. Rogers. Bagley asserted claims under 42 U.S.C. § 1983, alleging (1) excessive force in violation of the Fourth Amendment against the PNAs, (2) deliberate indifference by the RGSC supervisors in their training and supervision of the PNAs, and (3) deliberate indifference as to Bagley's medical care against Dr. Rogers.

Appellants filed an answer as well as a motion to dismiss arguing that Bagley's claims were HCLCs subject to the Texas Medical Liability Act's (TMLA) expert report requirement. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). Bagley responded that § 74.351 did not apply because he sought relief under federal law for excessive force. Bagley attached the autopsy report, Jeremiah's death certificate, and the report of the Office of Inspector General (OIG) from Texas Health and Human Services, which concluded that RGSC employees used improper restraint techniques. The trial court

---

[1] Appellants Modesto Zamorano, Stephanie Cumpian, Rolando Flores, Hector Ontiveros, and Priscilla Nieto.

[2] Appellants Sonia Hernandez-Keeble, Blas Ortiz, Jr., David Moron, M.D., and Jaime Flores.

3

denied the motion to dismiss, and this Court affirmed its ruling on appeal holding that "§ 1983 preempts § 74.351 when claims for excessive force occur within a healthcare institution or against a healthcare provider or physician." *Rogers v. Bagley*, 581 S.W.3d 362, 374 (Tex. App.—Corpus Christi–Edinburg 2019), *rev'd*, 623 S.W.3d 343 (Tex. 2021) (citations omitted).

The Texas Supreme Court reversed this Court's decision and held that the TMLA's expert report provision was a procedural requirement that was not preempted by federal law. *Rogers v. Bagley*, 623 S.W.3d 343, 356 (Tex. 2021). The court remanded the case to the trial court in the interest of justice because its holding "turn[ed] on a previously unaddressed preemption question" and the court "substantially clarified the law." *Id.* at 358.

Upon remand to the trial court, Bagley served appellants with the reports of Terri L. Calvert, M.D., Ruben Nieto, as well as a report authored by Sergeant Investigator Matthew Baird of the OIG and the autopsy report authored by Elizabeth Miller, M.D.

Dr. Calvert is a board-certified psychiatrist. In her report, she stated that the applicable standard of care is derived from the following provisions of Texas Health and Safety Code § 322.051:

(a) A person may not administer to a resident of a facility a restraint that: (1) obstructs the resident's airway, including a procedure that places anything in, on, or over the resident's mouth or nose; (2) impairs the resident's breathing by putting pressure on the torso; or (3) interferes with the resident's ability to communicate.

(b) A person may use a prone or supine hold on the resident of a facility only if the person: (1) limits the hold to no longer than the period specified by rules adopted under [§] 322.052; (2) uses the hold only as a last resort when other less restrictive interventions have proven to be ineffective; and (3) uses the hold only when an observer, who is trained to identify the risks associated with positional, compression, or restraint

4

asphyxiation and with prone and supine holds and who is not involved in the restraint, is ensuring the resident's breathing is not impaired.

TEX. HEALTH & SAFETY CODE ANN. § 322.051(a), (b). Dr. Calvert also cited the following provisions from the Texas Administrative Code:

(e) Staff shall not use more force than is necessary to prevent imminent harm and shall ensure the safety, well-being, and dignity of clients who are restrained[.]

. . . .

(j) The facility shall ensure adequate breathing and circulation during restraint[.]

. . . .

(m) A prone or supine hold shall not be used except as a last resort when other less restrictive interventions have proven to be ineffective. The hold shall be used only to transition a client into another position, and shall not exceed one minute in duration. Except in small residential facilities, when the prone or supine hold is used, an observer, who is trained to identify the risks associated with positional, compression, or restraint asphyxiation and with prone and supine holds, and who is not involved in the restraint, shall ensure the client's breathing is not impaired.

TEX. ADMIN. CODE ANN. § 564.706.

Dr. Calvert opined that "the amount of force used by [the PNAs] was not objectively reasonable proximately causing injuries to Jeremiah [as described by the autopsy report.]" Dr. Calvert stated that it appeared from video surveillance that Jeremiah "sustained significant injuries during the hold process." Referencing the OIG report, Dr. Calvert stated that "[t]he Master Trainer's assessment regarding the appropriateness of the . . . manual hold administered by the [PNAs], revealed that their technique was improper, likely resulting in serious injury to [Jeremiah.]" She opined that "the unit staff members . . . were not sufficiently trained to deal with such an aggressive patient, and

5

therefore their 'physical holds' were performed incorrectly, leading to injury and the subsequent death of [Jeremiah.]"

Dr. Calvert stated that the RGSC supervisors "each had a duty to ensure that [the PNAs] were each properly trained or supervised on the appropriate standards of care in using restraints." She opined that "it is very likely that the duty to ensure appropriate training was breached" and Jeremiah's "injuries were likely sustained during the physical hold[.]" Dr. Calvert stated that "psychiatry unit staff members[] should have more carefully considered the option of moving [Jeremiah] from the unit to another more appropriate unit[] when he became so adversarial with his peers." Dr. Calvert stated that "Dr. Ramona Rogers[] had a duty to not recklessly disregard Jeremiah's serious medical needs" and that "the standard of care was breached." She opined that Jeremiah's "death might have been prevented by moving him to another unit."

Nieto is a board-certified behavioral analyst with experience working as an outpatient behavioral services supervisor. Nieto opined that the PNAs used excessive force when restraining Jeremiah. Specifically, Nieto stated that it was inappropriate for the PNAs to forcibly take Jeremiah to the floor. Nieto explained "at the time of the initial onset of aggressive behavior(s), staff are to block attempts of punches by placing their hands cupped together over their forehead to protect their face using their forearms as a barrier." Nieto continued that the PNAs instead "grabbed and struck at [Jeremiah] escalating the aggression." Nieto stated that the PNAs should have responded to the initial aggressive behavior by stepping back from Jeremiah. Nieto opined that "[i]t is not appropriate for five [PNAs] to restrain one patient, much less on the floor and using their body weight." Nieto explained that a patient should be restrained in a prone or supine

6

hold only for transition lasting no more than a minute. He concluded that Jeremiah being restrained in this position for ten minutes by five PNAs was "excessive." Nieto stated that Jeremiah's injuries "indicate[] that excessive force was used during the restraint." Nieto was of the opinion that "the excessive force used on [Jeremiah] likely caused the fractures and other injuries detailing in the autopsy report resulting in his death."

In her autopsy report, Dr. Miller concludes that Jeremiah's died due to "[e]xcited delirium due to Psychosis with Restraint-Associated Blunt Force Trauma." Dr. Miller noted multiple injuries, which we have previously referenced.

Baird stated in his OIG report that he interviewed a prevention of management of aggressive behavior master trainer who informed him that the following actions of the PNAs were improper or incorrect: the "approach of [Jeremiah]"; "the grasping of [Jeremiah] by the shoulders"; "the pulling of [Jeremiah] face first toward the floor"; and "the restraining of [Jeremiah] on the floor with one arm over the shoulder and the other arm underneath [Jeremiah's] arm"; the involvement of three PNAs; and "holding [Jeremiah] down by the waist while the [PNAs] administered the restraint."

Appellants filed objections to the reports and a motion to dismiss. Appellants argued that the OIG report did not satisfy TMLA's requirements because it was not authored by a physician or health care practitioner. Appellants argued that the autopsy report was deficient because "there is no indication within the report that any statement therein constitutes an opinion by Dr. Miller." Appellants also asserted that there was no opinion regarding the standard of care, how it was breached, or how any purported breach caused Jeremiah's injuries.

Appellants objected that Dr. Calvert's report was deficient because, as a psychiatrist, she is not qualified to opine on causation. Appellants further argued that Dr. Calvert was not qualified to opine on the standards of care applicable to the PNAs and RGSC supervisors because "there is no indication . . . that [s]he is trained or experienced in physically restraining a psychiatric patient engaged in a violent outburst, nor in training or supervising those who perform such restraints." Appellants also maintained that Dr. Calvert's opinions concerning causation and departures from the standard of care by PNAs and RGSC supervisors were speculative and conclusory. Appellants argued that Dr. Calvert's opinion concerning Dr. Rogers were based on conjecture and speculation.

Appellants objected that Nieto was not qualified to opine on causation because he was not a physician. Appellants maintained that his report was "no report at all" with respect to the claims against Dr. Rogers for the same reason. They also stated that Nieto's report did not provide a standard of care applicable to RGSC supervisors or how that standard was breached and that Nieto is not qualified to opine on those issues in any case. With respect to the PNAs, appellants asserted that Nieto is not qualified to offer an opinion on the standard of care and any breach thereof. Appellants moved to dismiss Bagley's suit because the expert reports did not constitute a good faith effort to comply with the TMLA.

After Bagley filed a response, the trial court held a hearing and signed an order denying appellants' objections and motions to dismiss. This interlocutory appeal followed.

*See* Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. § 51.014(a)(9).

## II. DISCUSSION

### A. Standard of Review & Applicable Law

"The [TMLA's] expert-report requirement seeks 'to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit.'" *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)). "[T]he [TMLA] provides that no medical negligence cause of action may proceed until the plaintiff has made a good-faith effort to demonstrate that a qualified medical expert believes that a defendant's conduct breached the applicable standard of care and caused the claimed injury." *New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citing Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. § 74.351(l), (r)(6)). To constitute a good-faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claim has merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018) (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52–53 (Tex. 2002)).

If an expert report has not been timely served because elements of the report are deficient, the court may grant a thirty-day extension to cure the deficiencies. Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. § 74.351(c). The standard for granting a thirty-day extension is lenient and an extension should be granted if a report contains an expert's opinion that plaintiff's claim against the defendant has merit. *Tenet Hosps. Ltd. v. Bernal*, 482 S.W.3d 165, 176 (Tex. App.—El Paso 2015, no pet.) (citing *Scoresby*, 346 S.W.3d at 557).

9

However, if a report fails to meet this standard, the trial court must grant a defendant's motion for dismissal. *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012); TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). "A trial court may read several reports in concert in determining whether a plaintiff has made a good-faith effort to comply with the Act's requirements." *Miller v. JSC Lake Highlands Operations*, LP, 536 S.W.3d 510, 513 (Tex. 2017) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i)).

We review a trial court's ruling regarding the adequacy of an expert report under the TMLA for an abuse of discretion. *Baty*, 543 S.W.3d at 693. In doing so, we look only to the information within the four corners of the report. *Id.*; *see Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). "A trial court abuses its discretion if it rules without reference to guiding rules or principles." *Miller*, 536 S.W.3d at 512–13.

## B.    Causation

Appellants first argue that "Bagley failed to produce an adequate expert opinion regarding the causal relationship between [a]ppellants' conduct and Jeremiah's alleged injuries and death." Appellants also challenge the qualifications of Bagley's experts to opine on causation.

The causation element "requires that the expert explain 'how and why' the alleged negligence caused the injury in question." *Abshire*, 563 S.W.3d at 224 (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). "A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Id*. To meet this requirement, "the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Id.* (quoting

10

*Zamarripa*, 526 S.W.3d at 460). Proximate cause has two components: (1) foreseeability, and (2) cause-in-fact. *Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

A person is qualified to give opinion testimony concerning the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care only if he (1) is a physician and (2) is otherwise qualified to render opinions on the causal relationship under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.403(a); *Children's Med. Ctr. of Dallas v. Durham*, 402 S.W.3d 391, 400 (Tex. App.—Dallas 2013, no pet.). A medical license does not automatically qualify a doctor to testify about causation on every medical question. *See Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003). To be qualified under the rules of evidence, an expert must have "knowledge, skill, experience, training, or education" regarding the specific issue before the court. TEX. R. EVID. 702; *see Otero v. Richardson*, 326 S.W.3d 363, 371 (Tex. App.—Fort Worth 2010, no pet.) (holding that when the plaintiff's claim concerned a doctor's alleged negligence in treating an ankle fracture, the expert established his qualification by showing that he had treated "approximately 20,000 patients with orthopedic injuries").

"[A] medical expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different specialty under circumstances similar to those at issue in the case." *Tenet Hosps. Ltd. v. De La Riva*, 351 S.W.3d 398, 406 (Tex. App.—El Paso 2011, no pet.) (citing *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)). Further, if the subject matter is common to and equally recognized and developed in all fields of practice, any physician

familiar with the subject may testify as an expert. *Id.* at 406–07 (citing *Keo*, 76 S.W.3d at 732). However, the expert's qualifications must appear within the four corners of the expert report or its accompanying curriculum vitae (CV). *Cornejo v. Hilgers*, 446 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

First, there is no dispute that Baird and Nieto are not physicians; therefore, they are not qualified to render an opinion on causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); *see also Rio Grande Reg'l Hosp. v. Ayala*, No. 13–11–00686–CV, 2012 WL 3637368, at *9 (Tex. App.–Corpus Christi–Edinburg Aug. 24, 2012, pet. denied) (mem. op.) (concluding that a report could not satisfy the TMLA's expert report requirement as to causation because its author was not a physician).

Next, appellants argue that Dr. Calvert's report and CV fail to establish that she is qualified to opine on causation. They explain that Dr. Calvert, as a psychiatrist, has expertise in the diagnosis and treatment of mental disorders, but that this expertise does not render her qualified to opine on the cause of Jeremiah's physical injuries or his death. Bagley responds that because of the nature of the injuries, any medical doctor would be qualified to opine on causation.

To establish her qualifications, Dr. Calvert was required to demonstrate her knowledge, skill, experience, training, or education regarding the *specific issue* raised by Bagley's claim that would qualify her to give an opinion on that subject. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); TEX. R. EVID. 702; *Durham*, 402 S.W.3d at 400. Dr. Calvert's report and CV establish that she is a board certified and practicing adult psychiatrist. After obtaining an MD degree, she completed an internship and residency in psychiatry. She has years of experience in providing inpatient and outpatient psychiatric

12

treatment to inmates as well as non-incarcerated patients. While Dr. Calvert may be qualified to opine on matters relating to mental health care, nothing in her expert report and CV addresses how her knowledge, skill, experience, training, or education as a psychiatrist qualifies her to opine on the causal relationship between the physical restraint of Jeremiah and his death. *See Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.) ("Qualifications must appear in the expert report and cannot be inferred."); *see also Gower v. Univ. Behavioral Health of Denton*, No. 02-16-00245-CV, 2017 WL 3081153, at *9 (Tex. App.—Fort Worth July 20, 2017, no pet.) (concluding that psychiatrist did not show he was qualified to opine on causation concerning mental health patient who died from respiratory failure, brain death, pneumonia, and sepsis); *Matagorda Nursing & Rehab. Ctr., L.L.C. v. Brooks*, No. 13-16-00266-CV, 2017 WL 127867, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 12, 2017, no pet.) (mem. op.) ("Dr. Radelat is undoubtedly an experienced pathologist, but there is nothing in the report or [CV] explicitly addressing whether, or how, his vast experience as a pathologist qualifies him to opine on whether appellants' negligence caused Brooks's injuries."). Additionally, we are unable to conclude from the four corners of these documents whether this is a subject matter common to and equally recognized in all fields of medicine with which Dr. Calvert is familiar. *See Tenet Hosps.*, 351 S.W.3d at 406.

The only remaining report is Dr. Miller's autopsy report. Although the report articulates Jeremiah's injuries, it is deficient as to causation because it does not address the causal relationship between appellants' conduct and Jeremiah's death. *See Rusk State Hosp. v. Black*, 379 S.W.3d 283, 292–93 (Tex. App.—Tyler 2010), *aff'd*, 392 S.W.3d 88 (Tex. 2012) (holding that autopsy report did not contain any opinion on causation). For

the foregoing reasons, we conclude that Bagley's expert reports are deficient regarding causation as to each appellant, and the trial court abused its discretion in ruling otherwise. *See Baty*, 543 S.W.3d at 693.

**C.      Deviation from the Standard of Care**

Appellants next argue that Bagley failed to produce an adequate expert opinion that any appellant deviated from the applicable standard of care.

Standard of care is defined by what an ordinarily prudent physician or health care provider would have done under the same or similar circumstances. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001); *Naderi v. Ratnarajah*, 572 S.W.3d 773, 779 (Tex. App.—Houston [14th Dist.] 2019, no pet.). An expert report's sufficiency as to the breach element is tied to its sufficiency identifying the applicable standard of care. *See Baty*, 543 S.W.3d at 697. Identifying the standard of care is critical because whether a health care provider breached a duty of care cannot be determined without specific information about what the defendant should have done differently. *Abshire*, 563 S.W.3d at 226; *Palacios*, 46 S.W.3d at 880. It is not sufficient for the expert to simply state that he knows the standard of care and concludes that it was or was not met. *Palacios*, 46 S.W.3d at 880. However, the stated standard of care need not be complicated for it to be sufficient. *See Baty*, 543 S.W.3d at 697; *see also Patel v. Baker*, No. 14-21-00177-CV, 2022 WL 1633802, at *2 (Tex. App.—Houston [14th Dist.] May 24, 2022, pet. denied) (mem. op.).

If an HCLC is against a physician, a witness may qualify as an expert on the issue of a departure from the standard of care if the witness is a physician who:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

14

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a). The same requirements apply to an HCLC against a non-physician, except the expert witness need not be a physician. *See id.* § 74.402(b).

### 1.    Dr. Rogers

Appellants argue that Baird, Nieto, and Dr. Miller are not qualified to opine on the standards of care applicable to Dr. Rogers. They further argue that Dr. Calvert's report "does not identify any specific conduct by Dr. Rogers that breached a standard of care, and it does not provide any specific information about what Dr. Rogers should have done differently."

Appellants are correct that Baird and Nieto are not qualified to opine on whether Dr. Rogers departed from accepted standards of medical care because they are not physicians. *See id.* § 74.401(a). Further, Dr. Miller, offers no opinion on a departure from the standard of care, so her qualifications to do so are not at issue.

Appellants concede Dr. Calvert is qualified, but they maintain that her report is nevertheless deficient. We agree. Dr. Calvert's opinions as to Dr. Rogers were limited to the following: "Dr. Ramona Rogers[] had a duty to not recklessly disregard Jeremiah's serious medical needs" and that "the standard of care was breached." She opined that Jeremiah's "death might have been prevented by moving him to another unit." Dr. Calvert does not explain how and why Dr. Rogers breached the standard of care or what she

15

should have done differently. Dr. Calvert does not explain in what manner Dr. Rogers recklessly disregarded Jeremiah's serious medical needs. In particular, Dr. Calvert does not describe that the standard of care required moving Jeremiah to a different unit, she only states that it might have prevented his death. Put simply, Dr. Calvert fails to explain what Dr. Rogers should have done under the circumstances and what Dr. Rogers did instead. *See Palacios*, 46 S.W.3d at 880.

For the foregoing reasons we conclude that Bagley's expert reports are deficient regarding deviation from the standard of care as to Dr. Rogers, and the trial court abused its discretion in ruling otherwise. *See Baty*, 543 S.W.3d at 693.

## 2. RGSC Supervisors

Appellants argue that "[n]one of the experts' reports or CVs demonstrate knowledge and training or experience in training or supervising PNAs in the performance of a physical restraint in a psychiatric in-patient setting." They further argue that Dr. Calvert's report "does not identify any specific conduct by the administrators that breached a standard of care[.]" Bagley responds that the purpose of Nieto's report "was not to comment about the conduct of . . . the administrators" but that Dr. Calvert is qualified and her opinions concerning a breach by the administrators "is not conclusory." Bagley does not contend that Baird's report or the Dr. Miller's autopsy report establish a deviation from the standard of care by the supervisors; therefore, we will focus our analysis on Dr. Calvert's qualifications and opinion.

As stated, Dr. Calvert's report and CV shows that she has over thirty years of experience in providing inpatient and outpatient psychiatric treatment to inmates as well as non-incarcerated patients. This information shows she has worked in the same general

16

field as the RGSC supervisors. However, it does not show that she has experience in, or is qualified to opine on, training PNAs on the use of physical restraints, which is the specific issue raised by Bagley's claim. *See Estorque*, 302 S.W.3d at 26 ("Qualifications must appear in the expert report and cannot be inferred."). Therefore, we conclude that Dr. Calvert has not established that she is qualified to opine on the RGSC supervisors' deviation from the standard of care and that Bagley's expert reports are otherwise deficient in that regard. We hold that the trial court abused its discretion in ruling otherwise. *See Baty*, 543 S.W.3d at 693.

### 3. PNAs

Appellants argue that "[n]one of the experts' reports or CV's demonstrate knowledge and training or experience in the physical restraint" of a mental health patient. For the reasons we concluded Dr. Calvert was unqualified regarding the RGSC supervisors, we similarly conclude that she is not qualified as to the PNAs. Her report and CV do not show she has knowledge, skill, experience, training, or education in the physical restraint of mental health patients. Neither Dr. Miller nor Baird purport to be qualified in this area as well. As to Nieto, we note that he is a board-certified behavioral analyst with experience working as an outpatient behavioral services supervisor. However, there is no information in his CV and report showing that he has knowledge, skill, experience, training, or education in the physical restraint of mental health patients. *See Estorque*, 302 S.W.3d at 26. Accordingly, we conclude that Bagley's expert reports are deficient regarding whether the PNAs' deviation from the standard of care and that the trial court abused its discretion in ruling otherwise. *See Baty*, 543 S.W.3d at 693.

17

For the reasons discussed, we conclude that the trial court erred in ruling that Bagley's expert reports complied with the TMLA. We sustain appellants' sole issue.

### III.   EXTENSION

Texas Civil Practice and Remedies Code § 74.351(c) affords the trial court the ability to grant a thirty-day extension for a plaintiff to cure deficiencies in his expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). Thus, when an appellate court reverses a trial court's denial of a motion to dismiss a health care liability claim due to the omission of any of the statutory expert report requirements, the appellate court may remand the case to the trial court to consider granting a thirty-day extension for the plaintiff to cure the deficiencies in the expert report. *Leland v. Brandal*, 257 S.W.3d 204, 207–08 (Tex. 2008); *see also Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008) (stating deficient report may be cured by amending report or by serving new report from separate expert that cures deficiencies in previously filed report).

The trial court is in the best position to decide whether a cure for an inadequate expert report is feasible, and the Texas Supreme Court has instructed that "trial courts should be lenient in granting [a] thirty-day extension[ ] and must do so if [the] deficiencies in an expert report can be cured within the thirty-day period." *Scoresby*, 346 S.W.3d at 554. Accordingly, we remand the case to the trial court for consideration of whether the deficiencies identified by this Court can be cured, and whether to grant an extension of time.

## IV.    CONCLUSION

We reverse the trial court's order denying appellants' motion to dismiss, and we remand the cause for further proceedings consistent with this memorandum opinion.


L. ARON PEÑA JR.
Justice


Delivered and filed on the
8th day of May, 2025.