In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00105-CV**
_____

**RAEES AHMED AND DIAGNOSTIC GROUP, Appellants**

**V.**

**VERDINA MURPHY, Appellee**

**On Appeal from the 58th District Court**
**Jefferson County, Texas**
**Trial Cause No. A-200,315**

**MEMORANDUM OPINION**

In this interlocutory appeal, we decide whether the trial court abused its discretion by denying a healthcare provider's motion to dismiss a healthcare-liability claim based on the Texas Medical Liability Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*) (West 2017) (requiring a court to grant a motion challenging the adequacy of an expert report if the report does not represent an objective good faith effort to comply with the definition of an expert report in the Texas Medical Liability

1

Act). In their appeal, the healthcare providers, Raees Ahmed, M.D. and the Diagnostic Group, contend that the expert medical report the appellee filed fails to explain how their alleged breaches of the standard of medical care proximately caused the appellee's alleged injuries. *See id.* Because we conclude the trial court did not abuse its discretion when it denied the appellants' motion, we affirm the trial court's order.

## Background

In June 2017, Verdina Murphy sued Dr. Ahmed and the Diagnostic Group alleging that from April 30, 2015, to May 4, 2015, Dr. Ahmed failed to evaluate and treat her under the standard that applies to patients who have symptoms of having suffered an ischemic stroke. Put simply, Murphy alleged that Dr. Ahmed misdiagnosed her during her stay at Baptist Hospital with a transient ischemic attack and then discharged her without determining whether he should have treated her for a stroke.[1] Murphy claims that because Dr. Ahmed discharged her without consulting a neurologist and without prescribing the medications required to prevent another stroke, she suffered another stroke shortly after Dr. Ahmed discharged her from the hospital. According to Murphy, the second stroke and the second hospital admission

---

[1] According to Murphy's live petition, a transient ischemic attack "is a temporary clot that can cause stroke-like symptoms and usually resolves on [its] own."

2

required to treat it were avoidable had Dr. Ahmed properly diagnosed and treated her during her first hospital stay for a stroke.

Dr. Ahmed and the Diagnostic Group moved to dismiss Murphy's claims because the expert report, which she provided to them after suing, failed to explain sufficiently how Dr. Ahmed's acts and omissions proximately caused Murphy's alleged injury.[2] Dr. Camazine's report contains a separate section on causation and states:

> The main issue in this case is that Dr. Ahmed did minimal workup of the etiology of her stroke and minimal measures to prevent future CVAs. A pulmonologist elected to treat a brain stem stroke as a TIA with no neurology consultation of any kind. This failure allowed the patient to be treated with no consideration for any future strokes. In less than two weeks, Ms. Murphy's same symptomology worsened, and she was readmitted to the hospital with a stroke in virtually the same areas of the brain. At the second hospital, she was properly worked up, seen by a neurologist and had intensive therapy that is customary for a stroke workup. Had that been done on April 30th, I believe she would likely avoided the second admission and stroke.
>
> Had Dr. Ahmed utilized the correct standard of care, then Ms. Murphy would have been properly treated in a multidisciplinary approach by the correct specialists. This is why we have stroke centers and stroke protocols. She would have had a neurological and surgical consultation to ensure the clot causing her stroke was properly managed and dissolved. She would have undergone appropriate secondary stroke prevention administered by those specialists with a combination of aspirin and Aggrenox, and eventual anticoagulation such as Lovenox

---

[2] Murphy's response to Dr. Ahmed's and the Diagnostic Group's motion to dismiss clarifies that she seeks to hold the Diagnostic Group vicariously liable for Dr. Ahmed's alleged negligence.

or Coumadin within 1-2 weeks of discharge. Instead, Ms. Murphy was released with no consultations with any medical specialty other than physical therapy. Further, she was prescribed only aspirin and Plavix with no consideration for Aggrenox and eventual anticoagulation to further prevent a secondary stroke. These failures, as set out above, directly resulted in the recurrent posterior pontine stroke suffered by Ms. Murphy on 5/18/15, and in my opinion based upon a reasonable medical certainty would likely have been prevented had the standard of care been met.

Dr. Camazine's report suggests that the opinions he expressed in his report were "based upon reasonable medical probability[.]"

In their motion to dismiss, Dr. Ahmed and the Diagnostic Group argued that Dr. Camazine's opinions about causation were conclusory because he failed to explain, to a reasonable degree, how the treatment Dr. Ahmed gave Murphy caused her to have another stroke. When Murphy responded to the motion, she argued that Dr. Camazine's report adequately explained why Dr. Ahmed's acts and omissions caused Murphy to have another stroke. Following a hearing, the trial court denied the motion to dismiss. Subsequently, Dr. Ahmed and the Diagnostic Group filed an interlocutory appeal from the order denying their motion. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West Supp. 2017) (authorizing a party to file an interlocutory appeal from a ruling denying the party's motion to dismiss a healthcare-liability claim).

4

Standard of Review

In one appellate issue, Dr. Ahmed and the Diagnostic Group contend that the trial court abused its discretion when it denied their motion to dismiss Murphy's case. We review rulings denying motions to dismiss healthcare-liability claims based on allegedly deficient expert witness reports for abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877-78 (Tex. 2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992).

After a plaintiff sues a healthcare provider on a medical malpractice claim, the plaintiff must file an "expert report" not later than the 120th day after the date the defendant answers the suit. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2017). As defined by statute, an "expert report" is "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or healthcare provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id*. § 74.351(r)(6) (West 2017). To comply with the Texas Medical Liability Act, the Texas Supreme

Court has explained that an expert's report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios,* 46 S.W.3d at 875. A report that merely states the expert's conclusions on the applicable standard of care, breach, and causation "does not fulfill these two purposes." *Id.* at 879. Rather, "'the expert must explain the basis of his statements to link his conclusions to the facts.'" *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex. 1999)).

Even so, the Medical Liability Act requires a plaintiff in a medical malpractice suit to file an expert report supporting the plaintiff's claims to deter frivolous claims. *See Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). In reviewing such reports, the trial court need only determine whether the report before it represents a good faith effort to comply with the statutory definition for expert reports. *See Palacios*, 46 S.W.3d at 878. "Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the [expert's report]." *See id.* As for causation, the expert's report must link the expert's conclusion to the alleged breach that plaintiff is claiming occurred in the standard of care that applies to her treatment. *See Wright,* 79 S.W.3d at 53.

In their brief, Dr. Ahmed and the Diagnostic Group do not contend that Dr. Camazine's report failed to explain how he was qualified to express opinions about

6

the care that Dr. Ahmed provided to Murphy. Nor, do they complain that Dr. Camazine failed to identify the standard of medical care that applied to the treatment that Dr. Ahmed provided, or how his care failed to meet that standard. Instead, the appellants argue that Dr. Camazine's report is deficient because it fails to adequately link Dr. Ahmed's care to her injury, which in this case consists of the stroke Murphy suffered after Dr. Ahmed discharged her from the hospital.

Analysis

To determine whether Dr. Camazine's report complies with the Texas Medical Liability Act, we view the report in its entirety, rather than isolating specific portions or sections. *See Baty v. Futrell*, 543 S.W.3d 689, 695 (Tex. 2018). The report identifies eight separate breaches of the standard of care that Dr. Camazine asserts applied to the care that Dr. Ahmed provided to Murphy.[3] The breaches the report identifies include "[f]ailing to realize that Ms. Murphy had a CVA[4] rather than a TIA[.]" The report then suggests that the standard of care required three medical

---

[3] "Of course, the expert report's assertion that the standard of care requires or prohibits a particular action does not conclusively establish that fact. The parties to a medical-malpractice case may—and often do—disagree over what the standard of care in fact requires." *Baty v. Futrell*, 543 S.W.3d 689, 697 (Tex. 2018).

[4] The appellants have not argued that Dr. Camazine's report was inadequate because Dr. Camazine used several commonly used initialisms for medical terms in describing Murphy's treatment. As used in the report, we understand the initials "CVA" referred to the term cerebrovascular accident and the initials "TIA" referred to the term transient ischemic attack.

tests, which Dr. Ahmed did not order. According to Dr. Camazine, the standard of medical care required Dr. Ahmed to obtain neurology and vascular consults given both Murphy's symptoms and the results he received on the diagnostic tests that he ordered. And, the standard required Dr. Ahmed to consider measures to prevent a secondary stroke, including a specific medication that Dr. Camazine suggests Dr. Ahmed should have considered prescribing to reduce Murphy's risk of having another stroke.

The causation section of Dr. Camazine's report links Dr. Ahmed's alleged breaches in care to his decision to treat Murphy as having suffered a transient ischemic attack, rather than treating her for a brain stem stroke. The report links Murphy's secondary stroke to Dr. Ahmed's failure to prescribe a medication containing an antiplatelet agent. The causation section of Dr. Camazine's report also links Dr. Ahmed's claimed failure to obtain a neurology consult to his failure to perform additional testing. Dr. Camazine's report concludes that, had Dr. Ahmed consulted a neurologist, Murphy "would likely have avoided the second admission and stroke."

We conclude that, Dr. Camazine's report contains an adequate explanation regarding what steps Dr. Ahmed should have followed to avoid the complications Murphy suffered after Dr. Ahmed discharged her from the hospital. *See Baty*, 543 S.W.3d at 698; *Wright,* 79 S.W.3d at 53. His report then links Dr. Ahmed's failure

to follow those steps to Murphy's injury, the stroke she suffered after being discharged from Baptist Hospital. We conclude that the appellants have not shown that the trial court abused its discretion by denying their motion. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). We overrule the appellants' sole issue, and we affirm the trial court's order.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on June 11, 2018
Opinion Delivered August 16, 2018

Before Kreger, Horton and Johnson, JJ.

9