**Opinion issued August 21, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00061-CV

————————————

**AUSTIN BEHAVIORAL HOSPITAL, LLC OPERATING AS CROSS CREEK HOSPITAL AND, SUBJECT TO ITS PREVIOUSLY FILED SPECIAL APPEARANCE, ACADIA HEALTHCARE COMPANY, INC., Appellants**

**V.**

**EDDIE LEE WILSON AND CHESTER JACKSON SR. AS NEXT FRIEND OF CHESTER JACKSON JR., HEATHER MARTIN AS NEXT FRIEND OF C.C.J. AND C.C.J., AND PE'TRECIA RAY AS NEXT FRIEND OF D.H., Appellees**

---

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2021-23885

---

**MEMORANDUM OPINION**

Appellees—family members of Chester Jackson Jr.—allege that thirty-year-old Jackson was admitted to Cross Creek Hospital after having a mental health episode. Soon after his admission, Jackson experienced severe agitation requiring hospital staff to physically restrain him and administer a combination of antipsychotic and sedative medications. Jackson quit breathing almost immediately and went into cardiopulmonary arrest. Four hours after his admission to Cross Creek Hospital, Jackson was transferred to another hospital for emergency care. Jackson allegedly suffered severe brain injury, and he remains in a permanent vegetative state.

Jackson's family sued Cross Creek Hospital, appellant Acadia Healthcare Co., Inc., and several individuals asserting claims under the Texas Medical Liability Act.[1] As required under the TMLA, Jackson's family timely served an expert report opining that Cross Creek Hospital breached the standard of care owed to Jackson and caused serious bodily injury. Specifically, the report criticized Cross Creek Hospital's delay in initially treating Jackson for severe agitation, application of physical restraints to him, administration of medications to him, and delay in providing first aid and resuscitative efforts after he quit breathing.

---

[1] Acadia filed a special appearance, which the record indicates has not been decided by the trial court.

Acadia and appellant Austin Behavioral Hospital, which purportedly operates as Cross Creek Hospital (collectively, "the Providers"), objected to the expert report and moved to dismiss the lawsuit under the TMLA. The Providers also requested attorney's fees and costs. The trial court denied the motion.

In a single issue, the Providers contend that the trial court abused its discretion by overruling their objections to the expert report and denying their motion to dismiss.[2] They argue that the expert report did not adequately describe the standard of care, how they allegedly breached the standard of care, and how any breach caused Jackson's alleged injuries. In their reply brief, the Providers argue for the first time on appeal that the expert report did not address Acadia's conduct.

We hold that the expert report met the "modest requirement" imposed by the TMLA "at this early stage of litigation." *See Bush v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 714 S.W.3d 536, 543 (Tex. 2025); *see also Walker v. Baptist St. Anthony's Hosp.*, 703 S.W.3d 339, 342–43 (Tex. 2024) (per curiam). We affirm.

---

[2]     *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9) (authorizing party to appeal interlocutory order denying motion for relief under Civil Practice and Remedies Code Section 74.351(b) with exception not applicable here).

3

## Background

### A. Plaintiffs' Allegations and Lawsuit

As alleged in this lawsuit, Jackson had a mental health episode on April 19, 2019. His family called 911 and requested assistance in transporting Jackson to a mental health facility. A Burleson County Sheriff's Office deputy responded and observed Jackson with a blank stare and clammy skin, speaking gibberish, and sweating profusely. The deputy arrested Jackson and confined him in the Burleson County Jail for two days. A jailer allegedly abused him while he was in jail. Jackson was transported to Cross Creek Hospital, a mental health facility in Austin, where he was admitted at 2:15 p.m. on April 21, 2019. Jackson appeared to be in an altered mental state when he arrived at the hospital.

When hospital staff told him that he was no longer in jail, Jackson became uncooperative and demanded to leave the hospital because he did not consent to treatment. Dr. Caanan Blakemore and John W physically restrained Jackson.[3] Dr. Shamima Khan prescribed Jackson a combination of three medications, which Jackson's family calls a "B-52 cocktail," to be administered by injection. Nurse Jordan Gouldburn administered the medication to Jackson while he was restrained. About five minutes after the medication was administered and while being physically restrained in a prone position, Jackson became unconscious, his

---

[3]     The appellate record does not contain a full name for John W.

respirations were shallow, his pulse was faint, and he went into cardiopulmonary arrest.

Approximately four hours after his admission, Cross Creek Hospital staff transferred Jackson to St. David's Hospital for emergency medical treatment.[4] Jackson allegedly "suffered severe brain damage as a result of the hold and deprivation of oxygen to his brain." He remains in a minimally conscious state and is non-verbal, and he is confined to an assisted living facility.

Jackson's family filed suit on his behalf against Cross Creek Hospital, Acadia, and various doctors and nurses, including Blakemore, W, Khan, and Gouldburn.[5] The live petition asserted claims for federal nondiscrimination and civil rights violations, medical negligence under the TMLA, and assault and battery. *See* 29 U.S.C. § 794; 42 U.S.C. § 1981; TEX. CIV. PRAC. & REM. CODE §§ 74.001–.552.

## B.    Expert Report

Jackson's family served Cross Creek Hospital and Acadia with an expert report as required by the TMLA. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a),

---

[4]    The record and the responsive brief by Jackson's family variously refer to this hospital as St. Davis Hospital and St. David's Hospital. We refer to this hospital as St. David's Hospital.

[5]    The underlying lawsuit was filed by Eddie Lee Wilson and Chester Jackson Sr. as next friend of Jackson, who allegedly lacks capacity to bring suit on his own behalf; Heather Martin as next friend of minors C.C.J. and C.C.J.; and Pe'trecia Ray as next friend of minor D.H. The individual doctors and nurses named as defendants in the live petition are not parties to this appeal.

(r)(6). The report was authored by Dr. Lynn P. Roppolo, a practicing board-certified emergency medicine physician and professor of emergency medicine at the University of Texas Southwestern Medical Center in Dallas. Her qualifications are not disputed on appeal.

Roppolo based her opinions on Jackson's medical records, including records from Cross Creek Hospital, St. David's Hospital, and Travis County EMS which transported Jackson between the hospitals. Roppolo also reviewed video recordings showing Jackson's arrest, his incarceration during the two days in jail, and his arrival at Cross Creek Hospital.

Roppolo stated that Jackson was 30 years old and healthy when he was admitted to Cross Creek Hospital. She acknowledged that Jackson had reportedly suffered a mental health episode, and his family called the police for assistance. In jail, Jackson exhibited odd behavior, such as taking off his clothes and standing naked in the booking lobby, making nonsensical communications, exhibiting agitated behavior, and biting an officer. Jail medical records stated that Jackson was in a "state of psychosis and paranoid in delusions" and recommended inpatient psychiatric hospitalization. Jackson allegedly fell at the jail and "was physically tossed by an officer striking his head on a metal toilet." Roppolo stated, however, that the fall did not cause a change in Jackson's mental status or neurological function, nor did it induce signs of traumatic brain injury.

6

Jackson was transferred to Cross Creek Hospital two days after he was booked into jail. He was admitted directly to the psychiatric intensive care unit at 2:15 p.m. for agitation and gross psychosis. Dr. Jaswant Pandher, who is also named as a defendant, evaluated Jackson at 3:17 p.m. and diagnosed him with "unspecified schizophrenia spectrum and other psychotic disorder" and recommended acute inpatient psychiatric treatment. The medical records contained no additional notes concerning Jackson between his admission at 2:15 p.m. and 5:30 p.m.

At 5:30 p.m., Jackson became more agitated, stated that he wanted to leave, and periodically banged on doors and windows. At 5:36 p.m., he allegedly physically and verbally assaulted a hospital staff member and "intended to elope" from the hospital, so hospital staff put him in "an undescribed 'personal hold'" that Roppolo described as a physical restraint. Jackson was placed in this hold for sixteen minutes from 5:36 p.m. until 5:52 p.m. Within two minutes of placing him in the hold, hospital staff tried to de-escalate Jackson, but he continued to be hostile and assaultive. Dr. Khan prescribed a combination of antipsychotic and sedative medications known as a "B-52": 2 mg of lorazepam, 10 mg of haloperidol, and 50 mg of diphenhydramine. Nurse Gouldburn administered the prescribed medication at 5:47 p.m., eleven minutes after staff placed Jackson in a physical hold.

When hospital staff released Jackson from the physical hold five minutes later at 5:52 p.m., he was unconscious and unresponsive with shallow respirations and a

faint pulse. He was turned supine, but his pulse faded and became absent, his eyes were "fixed and dilated," and he showed "no signs of consciousness." Hospital staff initiated chest compressions at 5:54 p.m. and called EMS at 5:55 p.m. Staff continued chest compressions until EMS arrived. EMS used an automated external defibrillator to give Jackson one shock at 6:01 p.m. Jackson's pulse returned at 6:13 p.m., and he was "revived" at 6:14 p.m. He was transported to St. David's Hospital at 6:21 p.m.

At St. David's Hospital, Jackson was neurologically "completely unresponsive." He was intubated and given a feeding tube. A toxicology screen revealed the presence of benzodiazepines and marijuana. Jackson was treated for possible aspiration pneumonia and admitted to the critical care unit. In the following days, doctors diagnosed Jackson with severe cardiomyopathy. A neurological consultation raised concern that Jackson had an anoxic brain injury and hypoxic-ischemic encephalopathy which Roppolo explained "basically indicated that Mr. Jackson sustained brain [injury] from low oxygen levels." An MRI indicated that Jackson had diffuse anoxic brain injury.

Jackson remained in a vegetative state in early May 2019 with a tracheotomy tube to breathe and a feeding tube to receive nutrition because he was "no longer able to maintain these essential life-sustaining functions on his own due to his anoxic

8

brain injury." Jackson was transferred to a long-term care facility in June 2019, and he "currently remains in need of long-term care in a permanent vegetative state."

Regarding the standard of care owed by Cross Creek Hospital, Dr. Roppolo stated that the "care and treatment of an agitated patient should be based on the BETA guidelines, which stands for 'Best practices in the Evaluation and Treatment of Agitation.'" According to Roppolo, severe agitation is a medical emergency requiring emergent medical care and a prompt, appropriate response. The standard of care applicable to severely agitated patients is to first attempt de-escalation to prevent injury to the patient, others, and the environment. But Roppolo noted that de-escalation "is almost always not effective at this level of agitation."

Roppolo opined that severely agitated patients typically require medication to reduce agitation symptoms. Administering medication often requires physical restraint without the patient's consent. Two types of medication are usually administered: sedatives and antipsychotics if the patient has psychotic symptoms like Jackson did. Hospital staff administered 10 mg of haloperidol, 2 mg of lorazepam, and 50 mg of diphenhydramine, or Benadryl, to Jackson. Roppolo stated that haloperidol is an antipsychotic used for severe agitation. The typical dose is 5 mg, and the maximum dose is 10 mg for larger patients. Lorazepam is a benzodiazepine, which is a sedative commonly administered to severely agitated

patients alone or in combination with an antipsychotic medication. The usual dosage of lorazepam is 2 mg when administered with haloperidol.

Roppolo stated that the standard of care in this case required administering only 5 mg of haloperidol to control agitation because Jackson is average height and weight: "the dosage of 10 mg of haloperidol was twice the dose that is typically given to a patient of Mr. Jackson's height and weight." Roppolo also stated that it "is the widely accepted practice to refrain from using all three medications, a cocktail referred to as a B-52, as the addition of diphenhydramine only prolongs sedation of the patient which also may reduce a patient's ability to breathe effectively."

Roppolo also opined about physically restraining Jackson and placing him in a prone position. She stated that Jackson was "in a severely agitated state for a prolonged period of time then placed in a physical hold for a prolonged period of time in his severely agitated state as he was not given medications to reduce his agitated behavior until 11 minutes after he was placed in a physical hold." Jackson was also physically restrained in a prone position, which "reduce[s] an individual's ability to breathe effectively, to inhale oxygen and to exhale carbon dioxide." The combination of physical restraint, restraint in a prone position, and administration of "large doses of medication" can "further impair his ability to breathe."

Finally, Roppolo stated that Cross Creek Hospital staff did not adequately monitor Jackson and document his vital signs. She opined that the "standard of care

10

for individuals requiring sedation is to monitor their oxygenation, heart rate and rhythm, and exhaling carbon dioxide using simple monitoring equipment and to check vital signs (heart rate, respiratory rate, blood pressure) once the patient is in a state where these can be performed." But for two minutes after Jackson was released from physical restraint, hospital staff did not "clearly" document "that his respirations were shallow, his pulse was faint and he was unresponsive." No documentation showed that staff checked his vital signs or oxygenation levels.

Dr. Roppolo opined that Cross Creek Hospital deviated from the standard of care in four ways: (1) failing to control Jackson's agitation to avoid injury; (2) improperly restraining him; (3) administering the combination of medications at an excessive dosage; and (4) delaying first aid and resuscitation.

First, Roppolo opined that "the combination of the physical restraint, prone positioning and large doses of these medications to control his agitation prevented him from breathing effectively resulting in worsening his acidotic state, impaired his ability to breathe and ultimately caused his cardiopulmonary arrest in which he stopped breathing and his heart stopped beating."

Second, Roppolo opined that Jackson was restrained for too long and not medicated soon enough. She stated that "agitated patients who require physical restraint need to be promptly medicated to reduce their level of agitation." Cross Creek Hospital staff physically restrained Jackson for eleven minutes before

11

administering medication. Moreover, when Jackson was released from physical restraint five minutes after he was medicated, he "was completely limp, unresponsive, had shallow breathing and a faint pulse and was immediately followed by full cardiopulmonary arrest two minutes later." "There was a period of time before Mr. Jackson's physical hold was released when it should have been evident that his level of agitation had decreased," and at this time, hospital staff should have discontinued physical restraint.

Hospital staff also placed Jackson in a prone position while being physically restrained, and "the prone position is likely to cause greater restriction in breathing than other positions which in Mr. Jackson's situation, worsened his acidotic state as it prevented him from using his breathing to compensate for his metabolic acidosis." Untreated "acidosis can progress to a level that is incompatible with life resulting in cardiopulmonary arrest."

Third, Roppolo opined that Cross Creek Hospital staff administered too much medication to Jackson and did not consider Jackson's height and weight when determining the dosage. Both the "medication dosing and combination were excessive" for Jackson, who is an "average size male" weighing 169 pounds and standing at 5'8". Combining lorazepam and diphenhydramine with haloperidol "is not necessary and only increases and prolongs his sedation and does not help to reduce his agitation symptoms." Lorazepam and diphenhydramine are "CNS

12

depressants and can cause more respiratory depression resulting in reduced oxygenation and ventilation[.]" Roppolo stated that the standard of care requires (1) "administration of medications that have been titrated for an appropriate dose based on the patient's weight"; and (2) "only mixing drugs in a safe combination to not cause respiratory compromise which can result in hypoxia (low oxygen levels) and retention of carbon dioxide (causing respiratory acidosis) which may lead to cardiopulmonary arrest."

Fourth, Roppolo opined that hospital staff delayed providing first aid and resuscitative efforts to Jackson after he became unresponsive with shallow breathing and a faint pulse. The medical records contain no documentation that staff took any action for two minutes "until he was in full cardiopulmonary arrest." During this time, hospital staff did not obtain Jackson's vital signs, check his oxygen saturation levels, call 911, or obtain a crash cart. There is no indication "that anything was being done for his abnormal breathing such as ensuring he had a patent airway, supplementing his breathing with a bag-valve-mask or giving him oxygen . . . which are required by the applicable standard of care." According to Roppolo, "These basic life saving interventions could have made a critical difference in the two minutes before he was in full cardiopulmonary arrest and could have prevented the severe anoxic (without oxygen) brain injury that has forever changed his life."

In a conclusion paragraph, Dr. Roppolo opined that Jackson was admitted to Cross Creek Hospital as "a physically healthy man" who was "independently walking, talking, and eating" and without respiratory distress or prior underlying cardiac disease. She further opined that:

> His cardiopulmonary arrest was a result of a delay in addressing his agitation, prolonged physical hold, being given an excessive dose of medication causing respiratory depression, and a delay in medical attention immediately after the release of his physical hold when he was found to be unresponsive, breathing very shallow, and had a faint pulse.

Consequently, Jackson "suffered a catastrophic anoxic brain injury and can no longer communicate, feed himself, walk or perform any activities of daily living." Had Cross Creek Hospital followed the standards of care for an agitated patient, "Jackson would in reasonable probability not have suffered any significant neurological impairment. His anoxic brain injury is directly attributed to the deviations from accepted standards of care in April of 2019."

## C.     Objections to Expert Report and Motion to Dismiss

The Providers objected to Roppolo's expert report and moved to dismiss the claims against them arguing that the report was so inadequate that it amounted to no report at all. *See id.* § 74.351(b)(2), (r)(6). They argued that Roppolo inadequately described the standard of care owed by Cross Creek Hospital, how Cross Creek Hospital breached the standard of care, and how the breach caused Jackson's injuries. Acadia also argued that it was not affiliated with Cross Creek Hospital, and

14

Roppolo's report did not apply to it. The Providers also requested attorney's fees and costs. *See id.* § 74.351(b)(1). The trial court overruled the objections and denied the motion to dismiss. This appeal followed.

**Sufficiency of Expert Report**

In their sole issue on appeal, the Providers contend that the trial court abused its discretion by overruling their objections to the expert report and denying their motion to dismiss the suit on the ground that the expert report was inadequate under the TMLA.

**A.     Standard of Review and Governing Law**

We review a trial court's ruling regarding the adequacy of an expert report under the TMLA for an abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018); *see E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (per curiam) (stating that under abuse-of-discretion standard, "[c]lose calls must go to the trial court") (quotation omitted). In conducting our review, we consider only the information within the four corners of the report. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

A trial court may grant a motion challenging the adequacy of an expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [TMLA's] definition of an expert report." *Baty*, 543 S.W.3d at 693 (quoting TEX. CIV. PRAC. & REM. CODE

15

§ 74.351(*l*)); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6) (defining "expert report" as report that gives fair summary of expert's opinions on standard of care, breach of standard, and causation).

This standard does not require an expert report to marshal all the claimant's proof. *Baty*, 543 S.W.3d at 693; *see Bush*, 714 S.W.3d at 543 (stating that TMLA "imposes a modest requirement at this early stage of litigation" to provide fair summary of expert's opinions). But the report cannot be conclusory. *Baty*, 543 S.W.3d at 693. It must discuss the standard of care, breach, and causation with enough specificity to inform the physician or health care provider of the conduct that the claimant challenges and to supply the trial court with a basis to conclude that the claims have merit. *Id.*

The standard of care consists of what an ordinarily prudent physician or health care provider would do under the same or similar circumstances. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). The report must identify a specific act the physician or health care provider was required to perform or refrain from performing and explain how the duty was not fulfilled. *See Baty*, 543 S.W.3d at 694–95 (holding that report generally stating care should have been provided "in the proper manner" to avoid injury was conclusory; instead, adequate report must explain what defendant should have done differently). The report is inadequate if the standard of care or its ostensible breach can only be

16

inferred from the report. *See Palacios*, 46 S.W.3d at 880 (reasoning that expert report which was vague enough to encompass multiple unspecified complaints—closer monitoring, securer restraint, or something else entirely—was too conclusory and thus inadequate).

With respect to proximate causation, an expert report must identify "how and why" a breach of the standard of care caused the injury, harm, or damages by explaining the basis for the expert's statements and linking her conclusions to specific acts. *E.D. ex rel. B.O.*, 644 S.W.3d at 664. The report need only explain how, as a factual matter, the claimant will prove causation. *Id.* The credibility or believability of the expert's opinion is not relevant to the question of whether the report is adequate. *Id.*

Talismanic words and phrases are not required. *Baty*, 543 S.W.3d at 693. An expert report need not use legal terminology such as "proximate cause," "foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). But the report must explain, factually, how the claimant will prove that the physician or health care provider proximately caused the injury, harm, or damages. *Id.*

In evaluating the adequacy of an expert report, we read the report as a whole. *E.D. ex rel. B.O.*, 644 S.W.3d at 664. The report can be informal. *Palacios*, 46 S.W.3d at 879. The information in the report need not satisfy evidentiary

requirements that will apply on summary judgment or at trial. *Id.*; *see E.D. ex rel. B.O.*, 644 S.W.3d at 667 (reiterating that adequacy of report is not based on evidentiary standard and that expert report need not litigate merits as prerequisite to suit).

## B. Analysis

The Providers maintain that the trial court erred by finding the expert report adequate because the report did not demonstrate the applicable standard of care, how the Providers breached the standard of care, and how the breach of the standard of care caused Jackson's injuries. Specifically, they acknowledge that Dr. Roppolo criticized the amount of time it took to initially treat Jackson for severe agitation, the physical restraint used on him, the medication administered to him, and the delay in providing first aid after he became unresponsive.

The Providers argue, however, that the amount of time it took to initially treat Jackson is directed at jail officials rather than Cross Creek Hospital. They also argue that Roppolo did not state the length of time it was reasonable to use physical restraints or why the method of restraint fell below the standard of care. They also argue that the report indicates that the amount of haloperidol administered to Jackson was within the standard of care, and it does not explain what Cross Creek Hospital should have done when presented with a physician's medication order that fell within the standard of care. Finally, they argue that Roppolo does not state what

would have been a reasonable delay in providing first aid to Jackson after he became unresponsive. In addition to inadequately describing the standard of care and breach, the Providers argue that the expert report also does not explain how or why each act or omission caused Jackson's cardiopulmonary arrest and subsequent brain injury. Thus, they contend that Roppolo's opinions on the standard of care, breach, and causation are conclusory and present analytical gaps that render the expert report inadequate.

We disagree with the Providers' position that the report is inadequate.

The expert report spans thirteen pages (excluding Roppolo's seventeen-page curriculum vitae), and it is broken into separate sections containing her education and experience, background information about Jackson from his medical records, and opinions concerning the standard of care, deviations from the standard of care, and conclusions. The Providers' arguments simplify and mischaracterize the opinions contained within the report. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*) (providing that trial court may grant motion to dismiss suit based on inadequacy of expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report").

With respect to the applicable standard of care and its breach, Roppolo opined that BETA standards apply to the hospital's treatment of Jackson. In discussing the

19

standard, Roppolo addressed four acts or omissions by Cross Creek Hospital staff: (1) the delay in addressing Jackson's agitation; (2) placing him in a prolonged physical hold; (3) administering an excessive dose and improper combination of medication; and (4) delaying medical attention immediately after releasing Jackson from physical hold when he was unresponsive, was breathing shallowly, and had a faint pulse.

Regarding the delay in addressing Jackson's agitation, the expert report stated that "Jackson was clearly psychotic and in an agitated state for at least two days" and that "[n]othing was done to address Jackson's severe agitation other than de-escalation until he was at CCH two days later . . . ." We agree with the Providers that the expert report attributes this delay to the jail rather than to Cross Creek Hospital. Nevertheless, "an expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements [of the TMLA], and the trial court must not dismiss in such a case." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013). "A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue." *Id.* at 630. Thus, we consider whether the report adequately addressed other theories of liability.

Regarding physical restraint, the expert report opined that Cross Creek Hospital staff restrained Jackson for too long and did not medicate him soon enough. The report concedes that physical restraint can be part of a proper standard of care

20

when combined with prompt medication to reduce the level of agitation. But Roppolo opined that Cross Creek Hospital violated this standard of care by restraining Jackson for eleven minutes before administering any medication. Moreover, Jackson was "completely limp, unresponsive, had shallow breathing and a faint pulse," and he "immediately" went into "full cardiopulmonary arrest two minutes later." Roppolo stated that it should have been evident that his level of agitation had decreased during "a period of time" after he was medicated but before he was released from physical restraint. Additionally, he was physically restrained in a prone position. Roppolo opined that "[t]he physical hold and being in a prone position both reduce an individual's ability to breathe effectively[.]" She concluded that the use of physical restraints in a prone position increased his metabolic acidosis and "worsened his acidotic state as it prevented him from using his breathing to compensate for his metabolic acidosis," resulting in Jackson's cardiopulmonary arrest and "catastrophic anoxic brain injury[.]"

The Providers argue that the physical restraint opinions in the expert report are inadequate because Roppolo does not indicate how long physical restraints reasonably can be used, why the method of restraint fell below the standard of care, and how and why the physical restraint injured Jackson. This argument lacks merit. True, Roppolo did not state, for example, that it would have been proper to restrain Jackson for only eight minutes. But she did opine that there was a period of time

21

after medication was administered to Jackson and before he became limp and unresponsive that the medication would have reduced his level of agitation such that physical restraints were no longer necessary and should have been discontinued. She further opined that the physical restraints and placing Jackson in a prone position increased his acidosis and in turn reduced his ability to breathe which led to cardiopulmonary arrest and subsequent brain injury.

Moreover, Roppolo stated that the lengthy use of physical restraints in addition to improper medication fell below the standard of care and caused Jackson's injuries. She stated that the standard of care for treatment of an agitated patient permitted administering haloperidol, an antipsychotic medication, in combination with a sedative. But she stated that the standard requires a dosage of 5 mg and a maximum dosage of 10 mg for a larger person. She noted that medical records indicated Jackson weighed 169 pounds and was 5'8" tall, which is the profile of an "average size male." The standard of care therefore required that hospital staff administer only 5 mg to Jackson, but staff instead administered 10 mg.

Additionally, Roppolo opined that the combination of medication administered to Jackson fell below the standard of care. Cross Creek Hospital staff combined lorazepam and diphenhydramine with haloperidol, which "is not necessary and only increases and prolongs [Jackson's] sedation and does not help to reduce his agitation symptoms." Lorazepam and diphenhydramine "are both CNS

22

depressants and can cause more respiratory depression resulting in reduced oxygenation and ventilation[.]" Roppolo stated that "the standard of care requires only mixing drugs in a safe combination to not cause respiratory compromise which can result in hypoxia (low oxygen levels) and retention of carbon dioxide (causing respiratory acidosis) which may lead to cardiopulmonary arrest." Roppolo opined that the use of physical restraints and "being given an excessive dose of medication causing respiratory depression" contributed to Jackson's "catastrophic anoxic brain injury."

The Providers argue that the 10 mg of haloperidol administered to Jackson was within the standard of care as stated in Roppolo's report. This argument mischaracterizes the report. Roppolo stated that a 5 mg dose of haloperidol is within the standard of care for an "average size male" like Jackson, and 10 mg is the maximum dose for a larger patient. Thus, the report did not conclude that administering 10 mg of haloperidol to Jackson was within the standard of care.

The report also adequately explained how and why the physical restraints and administration of medication caused Jackson's injury. Individually and combined, these actions reduced Jackson's ability to breathe which directly led to his immediate cardiopulmonary arrest and subsequent brain injury. Within minutes of administering the medication and while in physical restraint, Jackson became unresponsive and quit breathing for several minutes.

This leads to the final area of Roppolo's opinion: Cross Creek Hospital delayed providing first aid to Jackson when he became unresponsive. Roppolo noted that the medical records contain no documentation that any first aid was provided to Jackson for two minutes after he became unresponsive and went into full cardiopulmonary arrest. There is no indication that hospital staff obtained Jackson's vital signs, checked his oxygen saturation levels, called 911, or obtained a crash cart during this two-minute period. There is also no indication that hospital staff took any action to help Jackson's abnormal airway. These "basic life saving interventions could have made a critical difference" during these two minutes and prevented his "severe anoxic (without oxygen) brain injury[.]" Each of these actions—physically restraining Jackson for too long, administering an excessive dosage of medication in an improper combination, and delaying first aid when he became unresponsive— alone and combined reduced Jackson's ability to breathe and caused his "catastrophic anoxic brain injury." Roppolo concluded that if the hospital had taken these actions, "Jackson would in reasonable probability not have suffered any significant neurological impairment."

These opinions are not conclusory and do not leave analytical gaps. The expert report provides sufficient specificity to inform Cross Creek Hospital of the conduct challenged by Jackson's family and to supply the trial court with a basis to conclude that the claim has merit. *See Baty*, 543 S.W.3d at 693, 694–95. The report further

24

identifies how and why the alleged breaches of the standard of care injured Jackson: that is, the breaches reduced Jackson's ability to breathe, caused him to become unresponsive and quit breathing, and directly led to cardiopulmonary arrest and severe anoxic brain injury leaving him in a permanent vegetative state. We therefore conclude that the expert report "provides a fair summary of the expert's opinions" regarding "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6).

We address one final contention that the Providers first briefed in their reply brief. They argue that the expert report does not address any action by Acadia, and therefore the trial court abused its discretion by not dismissing the claims Jackson's family brought against Acadia. Whether this argument is properly before us is an open question because the opening brief did not present argument on this point. *See McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (stating that issue raised for first time in reply brief is ordinarily waived). Nonetheless, we hold that the trial court acted permissibly in implicitly determining that the report's references to Cross Creek Hospital applied to Acadia. *See Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) (per curiam) ("When a party's alleged health care liability is purely vicarious, a

25

report that adequately implicates the actions of that party's agents or employees is sufficient.").

We hold that the trial court did not abuse its discretion by overruling the Providers' objections to the expert report and denying the motion to dismiss challenging the adequacy of the expert report. We overrule the Providers' sole issue.

## Conclusion

We affirm the trial court's order overruling the Providers' objections to the expert report and motion to dismiss the lawsuit.


David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.